Cliff C. **WILSON** et al.
v.
The **UNITED STATES.**
No. 134–64.

United States Court of Claims.
April 14, 1967.

---

Cliff C. Wilson, Osie B. Wilson, Martha E. Robinson, and Alfred P. Miller, pro se.

Michael I. Sanders, Washington, D. C., with whom was Asst. Atty. Gen. Mitchell Rogovin, for defendant. Philip R. Miller, Washington, D. C., of counsel.

Before COWEN, Chief Judge, and LARAMORE, DURFEE, DAVIS, COLLINS, SKELTON and NICHOLS, Judges.

## OPINION

PER CURIAM:

With minor modifications, the court is in agreement with Trial Commissioner Mastin G. White's findings and recommended opinion. Accordingly, the court adopts the findings and opinion, as so modified, as the basis for its judgment in this case.

Commissioner White's opinion,* as modified by the court, is as follows:

The plaintiffs in this case are Cliff C. and Osie B. Wilson (who are husband and wife), Alfred P. Miller (who is a nephew of Cliff C. Wilson), and Martha E. Robinson (who is a niece of Cliff C. Wilson). All the plaintiffs are residents of Texas.

In the present action, the plaintiffs seek to recover refunds of Federal income taxes previously paid for the several years during the period 1958–1961.

During the 4-year period mentioned in the preceding paragraph, the plaintiffs (along with six other relatives of Cliff C. Wilson who are not parties to the present litigation) were partners in Cliff C. Wilson & Partners, a partnership which owned and operated a cattle ranch in

Hemphill County, Texas. Cliff C. and Osie B. Wilson owned a one-ninth interest, Alfred P. Miller owned a one-ninth interest, and Martha E. Robinson owned a one-ninth interest in Cliff C. Wilson & Partners. Cliff C. Wilson was the managing partner of Cliff C. Wilson & Partners.

Cliff C. Wilson & Partners, in addition to being engaged in the cattle ranching business itself, owned a one-half interest in Starnes, Wilson & Co., a partnership which operated a cattle ranch in Ellis County, Oklahoma, during part of the period previously mentioned. The other one-half interest in Starnes, Wilson & Co. was owned by Kenneth D. and Mary Verne Starnes, who were husband and wife. Kenneth D. Starnes was the managing partner of Starnes, Wilson & Co. Mary Verne Starnes is a niece of Cliff C. Wilson. During the period 1958–1961, Mrs. Starnes was a partner in Cliff C. Wilson & Partners.

Cliff C. Wilson & Partners owned the land in Oklahoma on which Starnes, Wilson & Co. operated its ranching business.

### First Count of Petition

The question presented to the court in the first count of the petition is whether, as contended by the plaintiffs, Section 1013 of the Internal Revenue Code of 1954 (26 U.S.C. section 1013) "is unconstitutional in application to the sale of capital [*i. e.*, breeding] livestock which had been valued in inventory under the Farm Price accrual method. It is our opinion that the plaintiff's attack on the constitutionality of Section 1013 of the 1954 Code must fail, and, accordingly, that their claims set out in the first count of the petition must be rejected.

The question concerning the constitutionality of Section 1013 of the 1954 Code is raised by the plaintiffs because some of their claims directly involve the taxability of proceeds received in 1958 and 1959 from a sale of breeding cattle by Starnes, Wilson & Co. in 1958, and other

---

\* The opinion, findings of fact, and recommended conclusions of law are submitted

under the order of reference and Rule 57(a).

claims indirectly involve the taxability of the proceeds from a sale of breeding cattle by Cliff C. Wilson & Partners in 1957. All the breeding animals with which we are concerned in the present case had been held for 12 months or more from the date of acquisition and, accordingly, they were by statutory definition "property used in the trade or business," so that any gain derived from their sale could constitute capital gain rather than ordinary income (26 U.S.C. § 1231(b) (1) and (3)).

■ A rancher is permitted to use either a cash-receipts-and-disbursements method or an accrual method of accounting. If he uses an accrual method, he must also maintain an inventory account and he must value his livestock for the inventory either by the farm-price method or by the unit-livestock-price method.

The two partnerships previously mentioned, Cliff C. Wilson & Partners and Starnes, Wilson & Co., each elected to use an accrual-inventory method of accounting for all its livestock; and each partnership, at all times subsequent to the inception of the partnership's business, consistently valued its livestock in accordance with the farm-price method of inventorying livestock. The farm-price method provides for a valuation of livestock in the inventory at market price, less direct costs of disposition.

■ "The general and long-standing rule for all taxpayers, whether they use the cash or accrual method of accounting, is that costs incurred in the acquisition, production, or development of capital assets, inventory, and other property used in the trade or business may not be currently deducted, but must be deferred until the year of sale, when the accumulated costs may be set off against the proceeds of the sale. Under general principles of accounting, therefore, it would be expected that expenses incurred by ranchers in raising breeding livestock should be charged to capital account, even though the ranchers employed the cash method of accounting." United States v. Catto, 384 U.S. 102, 109–110, 86 S.Ct. 1311, 1315, 16 L.Ed.2d 398 (1966). However, ranchers are permitted by the tax laws and regulations to take a current deduction for the expenses incurred in raising their livestock, including their breeding animals, and this is so without regard to the method of accounting employed by a particular rancher.

■ In the case of a rancher who has a breeding herd and who uses an accrual-inventory method of accounting, the taking of a current deduction for the expenses incurred in raising the breeding animals is substantially counterbalanced by the requirement that the breeding animals which remain in the inventory at the end of a year be revalued, and that any increase in the inventory valuation of such animals at the end of the year over their inventory valuation at the beginning of the year be reported as ordinary income for income tax purposes. This procedure provides a simple means of capitalizing costs. Then, when breeding animals are sold by a rancher who uses an accrual-inventory system of accounting, Section 1013 of the Internal Revenue Code of 1954 provides that the cost basis to be used in determining capital gain "shall be the last inventory value thereof." Thus, an accrual-inventory rancher receives capital-gain treatment on the proceeds from the sale of breeding animals only to the extent, if any, that the proceeds exceed the last inventory valuation of the animals sold. In the meantime, such a rancher has been taxed, as for ordinary income, on the annual increments in the inventory valuation of the animals involved in the sale.

■ On the other hand, in the case of a rancher who has elected to use a cash method of accounting, the current deduction that is taken against ordinary income for the expenses incurred in raising breeding animals is not counterbalanced annually by any increase in the value of the breeding animals. The cash-method rancher is not concerned, from the accounting or income tax standpoint, with the value of breeding animals unless and until there is a sale or other disposition

of such animals. At that time, since the expenses involved in raising the animals have not been capitalized in any fashion, the cost basis of the breeding animals for the purpose of determining capital gain is zero, and the rancher who uses a cash method of accounting with respect to his breeding animals receives capital-gain treatment with respect to all the proceeds from the sale of such animals (after the costs of the sale are deducted).

The plaintiffs contend—and seemingly with justification—that, from the overall standpoint, the rancher who uses an accrual-inventory method of accounting with respect to breeding animals which are ultimately sold generally pays a higher income tax in relation to the value of the animals than would be paid with respect to similar animals by a cash-method rancher. The plaintiffs say that this is discriminatory; and they argue that Section 1013 of the Internal Revenue Code of 1954, which limits the accrual-inventory rancher to capital-gain treatment on the partion, if any, of the proceeds from the sale of breeding animals that is in excess of the last inventory valuation of such animals, must be regarded as unconstitutional because of the discriminatory treatment thus accorded accrual-inventory ranchers.

However, it should be borne in mind that at the inception of his business, a rancher has a free choice in deciding whether he will use a cash method or an accrual-inventory method of accounting. Each method of accounting has certain advantages over the other, and the rancher must exercise his judgment in making a determination as to whether, from the long-range standpoint, he prefers a cash method or an accrual-inventory method. In view of this initial freedom of choice, the rule is well established that once a rancher has selected and used a particular system of accounting, he cannot change to a different system of accounting for income tax purposes on his own volition, and if he desires to make such a change, he must first obtain the approval of the Commissioner of Internal Revenue. Niles Bement Pond Co. v. United States,

281 U.S. 357, 360, 50 S.Ct. 251, 74 L.Ed. 901 (1930); Carter v. Commissioner of Internal Revenue, 257 F.2d 595, 600 (5th Cir. 1958); United States v. Ekberg, 291 F.2d 913, 924 (8th Cir. 1961), cert. den. 368 U.S. 920, 82 S.Ct. 242, 7 L.Ed.2d 135 (1961). No request for, or authorization for, such a change has been granted by the Commissioner in the present case.

The plaintiffs assert a supposed right on the part of an accrual-inventory rancher to retroactively change his system of accounting in order to claim capital-gain treatment for income tax purposes on the entire proceeds from the sale of breeding animals, notwithstanding the previous use of an accrual-inventory method of accounting. Since the petition in this case was filed the Supreme Court's decision in United States v. Catto, supra, has resolved the previous conflict in the cases. The Court held that a taxpayer who elects to use an accrual-inventory system of accounting for his overall ranching operation may not use a cash method of accounting for his breeding livestock. The Court said (384 U.S. at p. 114, 86 S.Ct. at p. 1318), "Congress has granted the Commissioner broad discretion in shepherding the accounting methods used by taxpayers, and the uniform application of the unit-livestock-price method to the respondents' entire livestock operation is a reasonable exercise of the discretion rested by Congress in the Secretary and the Commissioner for the administration of the tax laws." While we recognize that the taxpayer herein used the "farm-price method," the Supreme Court's reasoning is equally applicable to it.

The Court did not see in the ultimate capital-gain advantage enjoyed by a cash basis rancher, otherwise similarly situated, a sufficient cause to hold the regulation involved (26 C.F.R. 1.471–6 (f)) unreasonable, particularly since the taxpayer did not wish to shift completely to the cash method; but only with respect to breeding animals. The same is true of the plaintiff herein. His fire is not directed at any Regulation but at

Section 1013 of the Internal Revenue Code of 1954, infra, but this difference does not help him. Section 1013 merely says,

> If the property should have been included in the last inventory, the basis shall be the last inventory value thereof.

If this could be unconstitutional it can only be so because in conjunction with other statutes and regulations it achieves the same discriminatory effect that failed to disturb the Court in *Catto*, supra. Therefore, this court must reject the plaintiff's contention in the present case that Section 1013 of the Internal Revenue Code of 1954 is unconstitutional in its application to a farm-price, accrual-inventory rancher.

Accordingly, since the sole basis of the alleged cause of action set out in the first count of the petition is the supposed unconstitutionality of Section 1013 of the 1954 Code, the claim set out in the first count of the petition must be rejected.

### Second Count of Petition

As indicated earlier in this opinion, the Starnes, Wilson & Co. partnership carried on a ranching business in Oklahoma. The land involved in this operation was owned by Cliff C. Wilson & Partners, which also owned a one-half interest in Starnes, Wilson & Co.

Starnes, Wilson & Co. ceased to function at the end of 1958, and that partnership was formally dissolved thereafter. At the beginning of 1959, Cliff C. Wilson & Partners, the owner of the land comprising the Oklahoma ranch, took over possession of the ranch, with the intention of leasing it to someone else.

On December 31, 1958, just before Starnes, Wilson & Co. went out of business, Cliff C. Wilson & Partners purchased from Starnes, Wilson & Co. all the livestock and equipment that Starnes, Wilson & Co. still had on hand.

The purchase price paid in connection with the transaction mentioned in the preceding paragraph was $3,867.19. This price was allocated by Cliff C. Wilson & Partners on the basis of $3,042.19 for the equipment and $825 for the livestock.

The actual value of the equipment and livestock purchased on December 31, 1958, by Cliff C. Wilson & Partners from Starnes, Wilson & Co. was only $1,913.19. The inflated price of $3,867.19 was paid by Cliff C. Wilson & Partners in order to avoid a lawsuit with Kenneth D. Starnes, the managing partner of Starnes, Wilson & Co. It was the intention of Cliff C. Wilson & Partners at the time of the purchase to resell the equipment and livestock.

On August 17, 1959, Robert C. Miller entered into a lease with Cliff C. Wilson & Partners for the Oklahoma ranch. The lease was for the term beginning August 17, 1959, and ending May 1, 1965.

Robert C. Miller is a nephew of Cliff C. Wilson. He was a partner in Cliff C. Wilson & Partners during 1958–1961.

On December 31, 1959, Cliff C. Wilson & Partners sold to Robert C. Miller the equipment and livestock which Cliff C. Wilson & Partners had purchased from Starnes, Wilson & Co. on December 31, 1958. As previously stated, the equipment and livestock had been acquired by Cliff C. Wilson & Partners for a price of $3,867.19. They were sold to Robert C. Miller for a price of $1,913.19. Hence, Cliff C. Wilson & Partners sustained a loss in the amount of $1,954 on the sale of the equipment and livestock to Robert C. Miller.

In its partnership income tax return for 1959, Cliff C. Wilson & Partners treated the loss of $1,954 as an ordinary loss. The Internal Revenue Service, on audit of the income tax return, disallowed this loss as an ordinary deduction, holding that it was a loss within the scope of Section 1231 of the Internal Revenue Code of 1954 (26 U.S.C. § 1231). Claims for refund on the basis of such disallowance were subsequently filed by the plaintiffs as partners in Cliff C. Wilson & Partners, and the claims were denied by the Internal Revenue Service.

In the present action, the plaintiffs claim (in the second count of the peti-

tion) that the loss of $1,954 on the sale to Robert C. Miller of the equipment and livestock previously purchased from Starnes, Wilson & Co. should be treated as a fully deductible expense under Section 162(a) of the Internal Revenue Code of 1954 (26 U.S.C. § 162(a)). That section provides in part as follows:

There shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business * * *.

The defendant contends, on the other hand, that the situation with which we are concerned in this part of the opinion is governed by Section 1231 of the 1954 Code. Subsection (a) of that section provides in part as follows:

If, during the taxable year, the recognized gains on sales or exchanges of property used in the trade or business * * * exceed the recognized losses from such sales [and] exchanges, * * * such gains and losses shall be considered as gains and losses from sales or exchanges of capital assets held for more than 6 months. * * *

In this connection, the record indicates that the gains of Cliff C. Wilson & Partners during the pertinent period on sales or exchanges of property used in the trade or business of the partnership exceeded the partnership's losses from such sales and exchanges. Therefore, it is necessary to consider whether the livestock and equipment which Cliff C. Wilson & Partners purchased from Starnes, Wilson & Co. and later sold to Robert C. Miller was "property used in the trade or business" of Cliff C. Wilson & Partners, and thus within the ambit of Section 1231 of the 1954 Code.

■ Subsection (b) (3) of Section 1231 defines the term "property used in the trade or business" to include (among other things) "livestock, regardless of age, held by the taxpayer for draft, breeding, or dairy purposes, and held by him for 12 months or more from the date of acquisition." The livestock which Cliff C. Wilson & Partners purchased from

Starnes, Wilson & Co. on December 31, 1958, was held by the former until December 31, 1959, or for 12 months. The record indicates, however, that such livestock was held by Cliff C. Wilson & Partners for the purpose of resale, rather than for draft, breeding, or dairy purposes. Accordingly, this phase of the transaction with Robert C. Miller on December 31, 1959, would be outside the scope of Section 1231 of the 1954 Code, and the loss sustained on the sale of the livestock would be deductible under Section 162(a) of the 1954 Code.

With respect to the equipment which Cliff C. Wilson & Partners purchased from Starnes, Wilson & Co. and thereafter sold to Robert C. Miller, there is a general definition of "property used in the trade or business" in subsection (b) (1) of Section 1231 to the effect that this term "means property used in the trade or business, of a character which is subject to the allowance for depreciation provided in section 167, held for more than 6 months * * *." Section 167 of the 1954 Code, in turn, provides (among other things) that "There shall be allowed as a depreciation deduction a reasonable allowance for the exhaustion, wear and tear (including a reasonable allowance for obsolescence)—(1) of property used in the trade or business * * *."

■ The equipment which Cliff C. Wilson & Partners acquired from Starnes, Wilson & Co. included a tractor. The other equipment is not specifically identified, except that it is referred to in the record as farm equipment. It is reasonable to infer that all this equipment was subject to exhaustion, wear, and tear, and, therefore, that it was of a type for which a depreciation deduction was proper. The equipment was held by Cliff C. Wilson & Partners for longer than 6 months, so the remaining question as to the applicability of Section 1231 of the 1954 Code is whether the equipment was "used in the trade or business" of Cliff C. Wilson & Partners.

From the beginning of 1959 until the Oklahoma ranch was leased to Robert C. Miller, Cliff C. Wilson & Partners was

engaged in the "trade or business" of owning a ranch in Oklahoma and preparing it for subsequent leasing to someone else. In this connection, the record indicates that the partnership carried on a program of repairing roads, windmills, and tanks on the ranch in order to enhance the leasability of the ranch. The record shows that the tractor which Cliff C. Wilson & Partners purchased from Starnes, Wilson & Co. was used by the former in the road-repair work. The inference seems warranted that the other pieces of equipment were used in connection with the repair of the windmills and tanks, since the record is silent concerning the ownership by Cliff C. Wilson & Partners in 1959 of any equipment that was usable for this purpose, other than the equipment discussed in this part and the next succeeding part of the opinion.

The conclusion seems to be justified, therefore, that the equipment which Cliff C. Wilson & Partners purchased from Starnes, Wilson & Co. was depreciable property which Cliff C. Wilson & Partners used in its "trade or business" of owning a ranch and rehabilitating it for leasing to someone else. Consequently, the defendant is correct in its contention that the loss on the sale of equipment to Robert C. Miller was within the scope of Section 1231 of the 1954 Code.

On the basis of the discussion set out in this part of the opinion, it appears that the plaintiffs are entitled to recover under the second count of the petition with regard to—and only with regard to—the loss that was sustained in connection with the sale of the livestock which had been purchased from Starnes, Wilson & Co. for the purpose of resale.

*Third Count of Petition*

As indicated in the immediately preceding part of this opinion, Cliff C. Wilson & Partners took over possession of the Oklahoma ranch at the beginning of 1959, after Starnes, Wilson & Co. went out of the ranching business. It was the intention of Cliff C. Wilson & Partners to lease the ranch to someone else, and the

partnership determined that it was necessary for certain rehabilitation work on the ranch to be accomplished in order to enhance the leasability of the ranch.

For one thing, the roads on the ranch were in need of repairs. After investigating the matter, Cliff C. Wilson, the managing partner of Cliff C. Wilson & Partners, concluded that it was cheaper for the partnership to purchase the necessary equipment and to employ the necessary workers to make the road repairs than it would be to engage a contractor to make such repairs. Accordingly, Cliff C. Wilson & Partners purchased the following equipment for the accomplishment of the road-repair work:

| | |
|---|---:|
| G.M.C. pickup truck | $2,260.00 |
| Chevrolet truck | 1,500.00 |
| Ford tractor & equipment | 3,900.79 |
| Ford truck (1947) | 200.00 |
| Dirt wagon | 150.00 |
| | $8,010.79 |

In addition to purchasing and using the equipment listed above in connection with the road-repair work, Cliff C. Wilson & Partners also used for this purpose a tractor that had been purchased from Starnes, Wilson & Co. for $250 on December 31, 1958 (see the immediately preceding portion of this opinion).

Cliff C. Wilson & Partners used the road-repair equipment, purchased at a cost of $8,010.79, solely to repair the roads on the Oklahoma ranch one time in 1959.

After this road-repair job was completed, Cliff C. Wilson & Partners leased the Oklahoma ranch on August 17, 1959, to Robert C. Miller for a term of years. On December 31, 1959, the road-repair equipment which the partnership had purchased in 1959 was sold to Robert C. Miller for $4,086.81, the partnership thereby sustaining a loss of $3,923.98 on the sale of the equipment.

In its income tax return for 1959, Cliff C. Wilson & Partners treated the loss on the sale of the road-repair equipment to Robert C. Miller as an ordinary

loss.[1] The Internal Revenue Service, however, disallowed the ordinary deduction. The plaintiffs, as partners in Cliff C. Wilson & Partners, subsequently filed claims for refund on the basis of such disallowance, and the claims were rejected by the Internal Revenue Service.

The problem involved in this part of the opinion is similar to the problem discussed in the immediately preceding portion of the opinion, i. e., whether the loss on the sale of road-repair equipment should be regarded as coming within the category of "ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business" (Section 162(a) of the 1954 Code), or as a loss from the sale of "property used in the trade or business" of the partnership (Section 1231 of the 1954 Code).

As stated in the immediately preceding part of this opinion, Cliff C. Wilson & Partners, from the beginning of 1959 until August 17, 1959, was engaged "in the trade or business" of owning a ranch and preparing it for leasing to someone else. The necessary preparatory work included repairs to the roads on the ranch in order to enhance the leasability of the ranch, and the equipment with which we are concerned in this part of the opinion was purchased for and used in connection with the road-repair work. Therefore, the road-repair equipment was used "in the trade or business" of Cliff C. Wilson & Partners. Since this equipment was of a character that was subject to an allowance for depreciation, and since it was held by Cliff C. Wilson & Partners for more than 6 months, it seems clear that the loss which Cliff C. Wilson & Partners sustained when it sold the road-repair equipment to Robert C. Miller was within the scope of Section 1231 of the 1954 Code.

As indicated in the immediately preceding part of this opinion, the gains of Cliff C. Wilson & Partners during the pertinent period on sales or exchanges of property used in the trade or business of the partnership exceeded the partnership's losses from such sales and exchanges. Consequently, Cliff C. Wilson & Partners was not entitled to take an extra deduction on the basis of the loss that was sustained in connection with the sale of the road-repair equipment to Robert C. Miller. In view of this, the plaintiffs are not entitled to recover under the third count of the petition.

### Fourth Count of Petition

The fourth count of the petition involves bad-debt deductions in the amounts of $1,000, $1,000, and $6,228.72 which the plaintiffs Cliff C. and Osie B. Wilson took on their joint income tax returns for the years 1959, 1960, and 1961, respectively, on the ground that the several amounts represented worthless business debts.

The subject of bad-debt deductions for income tax purposes is governed by Section 166 of the Internal Revenue Code of 1954 (26 U.S.C. § 166). That section first states the following general rule:

> There shall be allowed as a deduction any debt which becomes worthless within the taxable year.

The section subsequently makes a distinction between the treatment that is to be accorded business bad debts and non-business bad debts.

The several amounts which the Wilsons deducted as business bad debts in 1959, 1960, and 1961 grew out of a series of transactions that occurred in 1958 between Mrs. Osie B. Wilson and her nephew, Everett M. Blackwell, who was then a young man approximately 25 years of age.

Everett M. Blackwell's father, who was one of Mrs. Osie B. Wilson's brothers, died when Everett was a boy, and Everett became the ward of an uncle, Fred Blackwell, who was also Mrs. Wilson's brother. During a period of approximately

---

1. The amount of the loss was erroneously calculated to be $4,173.98 by Cliff C. Wilson & Partners, as the partnership included in the cost basis the price of the tractor which had been purchased from Starnes, Wilson & Co. for $250.

3½ years, beginning when Everett was about 14 years of age and continuing until he was about 17½ years old, he lived with his aunt, Mrs. Osie B. Wilson, and her husband. This was pursuant to arrangements made with the Wilsons by Fred Blackwell, Everett's guardian.

During 1958, Mrs. Osie B. Wilson made a number of financial advances or loans, totaling $8,228.72, to Everett M. Blackwell. The first advance or loan amounted to $114 and was made on or about February 1, 1958. At that time, Everett, who was then married and had not lived with the Wilsons for several years, went to see Mrs. Wilson and told her that he was unemployed and wanted to borrow $114 with which to make a payment on his passenger automobile. Mrs. Wilson let Everett have the $114.

Sometime in March 1958, Everett M. Blackwell went to see Mrs. Wilson again and wanted to borrow from her $600 with which to buy a used truck, so that he could go into the business of trucking for hire. Mrs. Wilson refused to make the loan at the time when she was first approached by Everett. Later, Fred Blackwell went to see Mrs. Wilson and requested that she reconsider her refusal to loan $600 to Everett. Fred Blackwell emphasized the fact that Everett was unemployed at the time, and expressed the opinion that Everett would repay the loan. On the basis of Fred Blackwell's representation, Mrs. Wilson let Everett have the $600.

During the remainder of 1958, Mrs. Wilson made numerous advances or loans to Everett M. Blackwell for such purposes as the acquisition of truck registration tags, a further payment on Everett's passenger automobile, paying off debts incurred as operating expenses in connection with Everett's trucking business, buying out the interest of Everett's partner in the trucking business, and purchasing diesel-powered trucks for the trucking business. As previously stated, the advances or loans made by Mrs. Wilson to Everett during 1958 totaled $8,228.72.

At the times when the several advances or loans were made, there was no understanding between Mrs. Wilson and Everett M. Blackwell concerning the payment of interest by Everett on the various amounts, and the transactions were not evidenced by any written documentation.

On or about August 28, 1958, Everett M. Blackwell signed four promissory notes in favor of Mrs. Wilson to cover the advances or loans which Mrs. Wilson had made to Everett during 1958. One of the notes was dated June 4, 1958, was in the amount of $1,000, and was payable to Mrs. Wilson on June 1, 1959, together with interest at 6 percent per annum. Another of the promissory notes was dated June 18, 1958, was in the amount of $1,000, and was payable on June 18, 1960, together with interest at 6 percent per annum. A third promissory note was dated July 27, 1958, was in the amount of $1,864.72, and was payable on July 27, 1961, together with interest at 6 percent per annum. The fourth promissory note was dated August 28, 1958, was in the amount of $4,364, and was payable on August 28, 1962, together with interest at 6 percent per annum.

Although the four promissory notes were prepared and signed on the same date, they were given different purported dates of execution and different due dates on the advice of counsel, so that bad-debt deductions could be claimed in different years if the notes were not paid.

Everett M. Blackwell never made any payment to Mrs. Wilson with respect to the advances or loans which Mrs. Wilson made to him in 1958. On her part, Mrs. Wilson never demanded any payment from Everett in connection with these transactions. Mrs. Wilson believed that Everett was not financially able to repay the advances or loans, or any part thereof.

Cliff C. and Osie B. Wilson claimed a business bad-debt deduction in the amount of $1,000 for 1959 on the basis of Everett M. Blackwell's failure to pay off

the promissory note in the amount of $1,000 that was due on June 1, 1959; they claimed a business bad-debt deduction in the amount of $1,000 for 1960 on the basis of Everett's failure to pay off the promissory note in the amount of $1,000 that was due on June 18, 1960; and they claimed a business bad-debt deduction in the amount of $6,228.72 for 1961 because of Everett's failure to pay off the other two promissory notes (although one of them was not due until August 28, 1962). All these deductions were disallowed by the Internal Revenue Service and deficiencies were assessed, which the Wilsons duly paid.

 As indicated earlier in this part of the opinion, Section 166 of the Internal Revenue Code of 1954 provides in part that:

> There shall be allowed as a deduction any debt which becomes worthless within the taxable year.

The plain language of this statutory provision obviously contemplates (1) the existence of a debt, (2) that the debt had value sometime during a taxable year, and (3) that the debt subsequently became worthless during the course of the taxable year.

In the present case, the defendant contends that, under the circumstances shown in the record, the several advances made by Mrs. Osie B. Wilson to her nephew were, in substance if not in form, gifts made without any reasonable expectation of repayment, and that such advances did not create debts in any real sense. I do not believe that it is necessary to decide this particular question, because even if it is assumed for the purpose of discussion that the financial advances which Mrs. Wilson made to her nephew were real loans and created real debts on the part of the nephew—and if it is further assumed that such debts were business rather than nonbusiness debts—the claims set out in the fourth count of the petition must nevertheless be denied due to the failure of Mr. and Mrs. Wilson to prove that the other essen-

tial elements prescribed by Section 166 of the 1954 Code were present in this case.

 Mr. and Mrs. Wilson, as the taxpayers, have the "burden of persuasion" concerning the issue of the deductibility of the alleged bad-debt items. Russell Box Co. v. Commissioner of Internal Revenue, 208 F.2d 452, 455 (1st Cir. 1953). However, the Wilsons have failed to provide the court with any substantial evidence in the record that would support findings to the effect that the $1,000 debt (if it was a debt) which they deducted for 1959 had value sometime in that year and then became worthless during 1959, or that the $1,000 debt which they deducted for 1960 had value sometime in 1960 and then became worthless during that year, or that the $6,228.72 debt which the Wilsons deducted for 1961 had value sometime in 1961 and then became worthless during that year.

Actually, the only inference on this point that can reasonably be drawn from the pertinent evidence in the record is that these several alleged debts were worthless at the beginning of the respective years and remained so continuously until the end of the respective years. Consequently, even if it is assumed for the purpose of discussion that the several amounts were not only debts but business debts, there is no proof in the record that would justify findings to the effect that such debts had value sometime in, and then became worthless during, the respective taxable years for which business bad debt deductions were claimed by the Wilsons. In the absence of such proof, Mr. and Mrs. Wilson are not entitled to recover on the issue presented in the fourth count of the petition relative to the bad-debt deductions. Russell Box Co. v. Commissioner of Internal Revenue, supra, at page 455; Bratton v. Commissioner of Internal Revenue, 217 F.2d 486, 488 (6th Cir. 1954).

*Fifth Count of Petition—Investment Expenses*

During the period 1958–1961, Cliff C. and Osie B. Wilson were active in purchasing and selling common stocks for

their own account. Their objective in such activities was to make a profit; and they did make a profit on some of the transactions, while losses were incurred on other transactions. Gains and losses were reported as capital gains and losses for income tax purposes.

The Wilsons did not buy or sell stocks for other persons on a commission basis.

The portfolio of common stocks owned by the Wilsons averaged about $700,000 (at the then-current market prices) during the period 1958–1961.

In determining from time to time which common stocks they would purchase and which of the common stocks in their portfolio they would sell, the Wilsons devoted a substantial amount of time to the performance of research on stock-market conditions and trends, and on the past history, the then-current status, and the seeming future prospects of particular common stocks that were under active consideration either for purchase or for sale. Mr. Wilson devoted an average of perhaps two hours a day during 1958 and 1959, and an average of perhaps three hours a day in 1960 and 1961, to such research work and other activities involved in the purchase and sale of common stocks. Mrs. Wilson devoted an average of perhaps three or four hours per week to the program.

In performing the research work referred to in the preceding paragraph, Mr. and Mrs. Wilson utilized (among other materials) literature and other aids which they obtained from Moody & Company and from Standard & Poor, and for which they paid. The amounts expended for such materials during the several years involved in this litigation were as follows:

| | |
|---|---|
| 1958 | $543 |
| 1959 | 150 |
| 1960 | 144 |
| 1961 | 144 |

Mr. and Mrs. Wilson purchased some common stocks on margin during the period 1958–1961, although such purchases were relatively small in comparison to the total volume of common stocks purchased by the Wilsons during that period. Interest payments on the Wilson's margin account during the several years involved in the present case were as follows:

| | |
|---|---|
| 1958 | $ 8.05 |
| 1959 | 105.82 |
| 1960 | 35.38 |
| 1961 | 89.06 |

In their joint income tax returns for the several years during the period 1958–1961, the Wilsons claimed as business deductions the respective amounts which they expended for literature and other aids to be used in the performance of research on common stocks, and also the respective amounts which they expended in the form of interest payments on their margin account. They also took for each of these years the standard deduction of $1,000 in lieu of itemizing permissible nonbusiness deductions.

In auditing the Wilsons' income tax returns for the several years during the period 1958–1961, the Internal Revenue Service determined that the Wilsons were not entitled to take as business deductions the several amounts previously mentioned in this part of the opinion as investment expenses. The Internal Revenue Service held, in effect, that the Wilsons could either take the standard deduction of $1,000 for each year or itemize allowable nonbusiness deductions, whichever would be larger, and that their investment expenses could be included in any itemization of nonbusiness deductions.

The result of the action by the Internal Revenue Service was that, for the year 1958, the Wilsons elected to claim itemized deductions that exceeded $1,000, including their investment expenses for that year in the amounts of $543 and $8.05. Similarly, for 1959, the Wilsons elected to claim itemized deductions that exceeded $1,000, including their investment expenses of $150 and $105.82. On the other hand, the Wilsons elected to claim the standard deduction of $1,000 for each of the years 1960 and 1961, so their investment expenses in the amounts of $144 and $35.38 for 1960, and in the

amounts of $144 and $89.06 for 1961, were ignored for income tax purposes.

The Wilsons subsequently filed claims for refund on the basis of the disallowance of their investment expenses as business deductions for 1958, 1959, 1960, and 1961. The claims were denied by the Internal Revenue Service.

The legal question presented in connection with this phase of the case is whether the investment expenses of Mr. and Mrs. Wilson were within or outside the scope of Section 162(a) of the Internal Revenue Code of 1954 (26 U.S.C. § 162(a)). That section provides in part as follows:

> There shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business * * *.

 It is my opinion that the investment expenses of Mr. and Mrs. Wilson during the period 1958–1961 were not paid or incurred in carrying on a "trade or business." In this connection, the Supreme Court has said that "investing is not a trade or business." Whipple v. Commissioner of Internal Revenue, 373 U.S. 193, 202, 83 S.Ct. 1168, 1174, 10 L. Ed.2d 288 (1963). Consequently, managing one's own investments in securities is not the carrying on of a trade or business, irrespective of the extent of the investments or the amount of time required to perform the managerial functions. Higgins v. Commissioner of Internal Revenue, 312 U.S. 212, 218, 61 S.Ct. 475, 85 L.Ed. 783 (1941).

It appears, therefore, that the plaintiffs Cliff C. and Osie B. Wilson are not entitled to recover on the phase of the fifth count relating to their investment expenses.

### Fifth Count of Petition—Literary Expenses

Ever since she was about 9 years old, Mrs. Osie B. Wilson has aspired to be a writer. She has taken many courses of instruction in writing; she has attended many meetings of writers; she has written many stories and articles; and she has received many rejection slips, although some of her material has been published.

During the 1930's, 1940's, and 1950's, while Mrs. Wilson was living in the Panhandle region of Texas with her husband, she submitted numerous feature articles on historical subjects to the Amarillo Daily News. These feature articles related to pioneer times and conditions on the Texas Plains, and to the settlers, peace officers, doctors, ranchers, buffalo hunters, and pioneer women who lived in that region during the early days. Some of these pieces were accepted and published by the Amarillo Daily News, which paid Mrs. Wilson modest fees for the articles accepted.

Mrs. Wilson and her husband moved from the Texas Panhandle to Mustang Island on the Texas Gulf Coast in 1959, and they lived there through 1960. While living on Mustang Island, Mrs. Wilson engaged in news-gathering activities concerning local events, wrote about them, and submitted the items to the Corpus Christi Caller and the Aransas Pass Progress. These newspapers accepted some of the material submitted by Mrs. Wilson, and paid her small amounts for the material accepted.

During the period 1958–1960, Mrs. Wilson worked rather regularly at her writing and related activities, devoting approximately half of her time to such efforts.

In 1958, Mrs. Wilson incurred expenses that aggregated $236.20 in connection with her writing activities and the submission of articles to the Amarillo Daily News. In 1959 and 1960, when she was writing articles and submitting them to the Corpus Christi Caller and the Aransas Pass Progress, her expenses in connection with such activities amounted to $440.59 for 1959 and $380.79 for 1960.

Mrs. Wilson did not receive any income in 1958 from her literary activities. In 1959, her gross income from the sale of newspaper articles amounted to $18.50. In 1960, Mrs. Wilson's gross income from

her literary activities increased to $202.25.

In their joint income tax returns for 1958, 1959, and 1960, Cliff C. and Osie B. Wilson claimed as business deductions the respective amounts of $236.20, $440.59, and $380.79 previously mentioned as expenses incurred by Mrs. Wilson in connection with her literary activities. For each of these years, Mr. and Mrs. Wilson also claimed the standard deduction of $1,000 in lieu of itemizing permissible nonbusiness deductions.

In auditing the income tax returns of Mr. and Mrs. Wilson for 1958, 1959, and 1960, the Internal Revenue Service determined that the Wilsons were not entitled to treat Mrs. Wilson's literary expenses as business deductions, but that such expenses might be claimed as permissible nonbusiness deductions if the Wilsons wished to itemize their nonbusiness deductions in lieu of taking the standard deduction of $1,000. As a result of the action by the IRS, the Wilsons itemized their deductions for 1958 and included Mrs. Wilson's literary expenses in the amount of $236.20. The same procedure was followed by the Wilsons for 1959, and they included among their itemized deductions Mrs. Wilson's literary expenses in the amount of $440.59. On the other hand, the Wilsons elected to take the standard deduction of $1,000 for 1960, with the result that the $380.79 representing Mrs. Wilson's literary expenses for 1960 was not included in the calculation of their income tax liability for 1960.

The disallowance of Mrs. Wilson's literary expenses as business deductions for 1958, 1959, and 1960 formed a basis for refund claims, which the Internal Revenue Service denied.

Here, again, the question presented to the court is whether Mrs. Wilson's literary expenses during the years 1958, 1959, and 1960 were paid or incurred in carrying on a "trade or business", within the meaning of the quoted phrase as used in Section 162(a) of the 1954 Code.

In view of the fact that Mrs. Wilson did not receive any income at all from her writing activities in 1958, that her income from this source for 1959 amounted only to $18.50 (in contrast to literary expenses that aggregated $440.59 in 1959), and that Mrs. Wilson's income from her writing activities in 1960 did not go beyond $202.25 (whereas her literary expenses for that year amounted to $380.79), it would be incongruous to say that her writing was a "trade or business" during the 3-year period. On the contrary, the impression to be gained from the record as a whole is that Mrs. Wilson, for many years prior to 1958, wrote as a hobby, and that her writing activities during the period 1958–1960 were those of a literary hobbyist, rather than the efforts of a person engaged in writing as a "trade or business."

It is my opinion, therefore, that the plaintiffs Cliff C. and Osie B. Wilson could not properly utilize Mrs. Wilson's literary expenses in 1958, 1959, and 1960 as business deductions for those respective years.

### Fifth Count of Petition—Litigation Expenses

Prior to the institution of the present litigation, the plaintiffs Cliff C. and Osie B. Wilson successfully prosecuted against the United States an action for the recovery of Federal income tax paid for the year 1951. The points at issue in the former litigation were the nature and extent of the taxable gains realized by the Wilsons on sales of livestock in 1951.

In prosecuting the litigation mentioned in the preceding paragraph, Mr. and Mrs. Wilson incurred legal expenses that amounted to $849.51 in 1958 and $1,663.43 in 1959.

The amount recovered by Mr. and Mrs. Wilson in the prior litigation exceeded by a considerable margin the total amount of the expenses incurred by them in successfully prosecuting the litigation.

In their joint income tax returns for the years 1958 and 1959, Mr. and Mrs. Wilson claimed as business deductions the respective amounts of $849.51 and

$1,663.43 previously mentioned as expenses incurred in the prosecution of the prior litigation. The Wilsons also took for each of these years the standard deduction of $1,000 in lieu of itemizing their nonbusiness deductions.

Upon auditing the Wilsons' income tax returns for 1958 and 1959, the Internal Revenue Service held that the respective items of $849.51 and $1,663.43 were not properly deductible as business expenses, but that they were deductible as nonbusiness expenses if the Wilsons elected to itemize their nonbusiness deductions in lieu of taking the standard deduction of $1,000 for each year.

As a result of the action by the Internal Revenue Service, the Wilsons elected to take for 1958 and 1959 itemized deductions that exceeded $1,000 for each year, and they included among such itemized deductions the litigation expenses amounting to $849.51 for 1958 and $1,663.43 for 1959.

Claims for refund were later filed by the Wilsons on the basis of the disallowance of the $849.51 and the $1,663.43 items as business deductions for 1958 and 1959, respectively. The claims were rejected by the Internal Revenue Service.

Mr. and Mrs. Wilson contend in the present case that their litigation expenses in 1958 and 1959 were paid or incurred in carrying on Mr. Wilson's "trade or business" of cattle ranching and, accordingly, that the respective amounts of $849.51 and $1,663.43 were properly deductible as business expenses under Section 162(a) of the Internal Revenue Code of 1954.

In this connection, the evidence shows that in 1951, and also in 1958 and 1959, Mr. Wilson was engaged in the business of raising and selling livestock. He did not have any other business in those years. Since the prior litigation related to the nature and extent of the taxable gains realized on sales of livestock, it would appear that the expenses incurred in successfully prosecuting the litigation were incurred in carrying on Mr. Wilson's "trade or business" and,

therefore, were properly deductible as business expenses.

In its brief, the defendant does not interpose any objection to a recovery by Mr. and Mrs. Wilson on this phase of the present litigation.

*Sixth Count of Petition*

As mentioned earlier in this opinion, Cliff C. Wilson & Partners owned a ranch in Ellis County, Oklahoma, and took over possession of the ranch at the beginning of 1959, after a former lessee, Starnes, Wilson & Co., went out of the ranching business. Cliff C. Wilson & Partners retained possession of the Oklahoma ranch until about the middle of August 1959, and conducted during the intervening period a program of rehabilitation designed to enhance the leasability of the ranch.

There were two dwelling houses and a bunkhouse on the Oklahoma ranch. During the period from the beginning of 1959 until about the middle of August 1959, one dwelling house was occupied by Cliff C. and Osie B. Wilson, the other dwelling house was occupied by a married employee of Cliff C. Wilson & Partners and his family, and the bunkhouse was occupied by four single employees of Cliff C. Wilson & Partners.

Mr. and Mrs. Wilson lived on the Oklahoma ranch during the period previously mentioned so that Mr. Wilson, the managing partner of Cliff C. Wilson & Partners, might look after the property and protect it from theft, and might effectively supervise the activities of the workmen employed on the ranch by Cliff C. Wilson & Partners to perform the repair work that was involved in the improvement program.

While the rehabilitation work on the Oklahoma ranch was in progress, Cliff C. Wilson & Partners provided food and housing for the married employee and the four single employees, as part of their compensation. The partnership defrayed the cost of purchasing the necessary groceries and paid the wife of the married employee wages to prepare meals for the five employees. The partnership also defrayed the cost of purchasing the fuel

that was needed to heat the bunkhouse and the dwelling house that was occupied by the married employee and his family, and to cook the meals for the five employees.

During the period in 1959 while Mr. and Mrs. Wilson were living on the Oklahoma ranch and Mr. Wilson was supervising the program of repair work, the cost of the groceries consumed by Mr. and Mrs. Wilson amounted to $200, and the cost of the fuel that was used in heating the dwelling house occupied by the Wilsons and in preparing their meals amounted to $191.14. Mr. Wilson paid these amounts out of the partnership funds of Cliff C. Wilson & Partners.

In reporting their 1959 gross income for income tax purposes, the Wilsons did not include the amounts of $200 and $191.14 mentioned in the preceding paragraph.

When the Internal Revenue Service audited the Wilsons' income tax return for 1959, the IRS included in the Wilsons' gross income the items of $200 and $191.14 previously mentioned. This resulted in a deficiency assessment against the Wilsons, which they duly paid.

With respect to the point now under consideration, the plaintiffs Cliff C. and Osie B. Wilson rely on Section 119 of the Internal Revenue Code of 1954 (26 U.S.C. § 119). That section provides in part as follows:

There shall be excluded from gross income of an employee the value of any meals or lodging furnished to him by his employer for the convenience of the employer, but only if—

(1) in the case of meals, the meals are furnished on the business premises of the employer, or

(2) in the case of lodging, the employee is required to accept such lodging on the business premises of his employer as a condition of his employment.

In this connection, the Wilsons assert—and with justification, on the basis of the evidence in the record—that they lived on the Oklahoma ranch from the beginning of 1959 until about the middle of August 1959 for the convenience of Cliff C. Wilson & Partners, the owner of the ranch, and that this was a matter of practical necessity in order that the ranch property might be looked after and the program of repair work on the ranch might be properly supervised.

■ The trouble is, however, that the "convenience of the employer" rule that is embodied in Section 119 of the 1954 Code does not have any application to the facts of this case. The owner of the Oklahoma ranch was a partnership, Cliff C. Wilson & Partners, and Mr. Wilson was the managing partner of the partnership. A partnership is not a legal entity separate and apart from the partners, and, accordingly, a partnership cannot be regarded as the employer of a partner for the purposes of Section 119 of the 1954 Code. Commissioner of Internal Revenue v. Doak, 234 F.2d 704, 708 (4th Cir. 1956); Commissioner of Internal Revenue v. Moran, 236 F.2d 595, 598 (8th Cir. 1956); Commissioner of Internal Revenue v. Robinson, 273 F.2d 503, 504–505, 84 A.L.R.2d 1211 (3rd Cir. 1959), cert. den. 363 U.S. 810, 80 S.Ct. 1246, 4 L.Ed.2d 1152 (1960).

■ The expenses of Mr. and Mrs. Wilson for groceries and for heating and cooking fuel while living on the Oklahoma ranch in 1959 were, therefore, outside the scope of Section 119 of the 1954 Code. Rather, these expenses were within the scope of Section 262 of the 1954 Code (26 U.S.C. § 262), which provides that:

Except as otherwise expressly provided in this chapter, no deduction shall be allowed for personal, living, or family expenses.

■ Expenses for food and for fuel with which to cook the food and heat a home are essentially personal in nature. Everyone must have these necessities of life, and expenditures to obtain them do not lose their personal characteristics because they may con-

tribute indirectly to a taxpayer's business activities. Commissioner of Internal Revenue v. Moran, supra, 236 F.2d at page 597. Rather, in such a situation, they are by their nature predominantly personal with a tinge of business, and not business expenses with a personal tinge. Commissioner of Internal Revenue v. Doak, supra, 234 F.2d at page 709.

For the reasons set out in this part of the opinion, it appears that the Internal Revenue Service acted correctly in adding to the gross income of Mr. and Mrs. Wilson for 1959 the amounts of $200 and $191.14 which they received out of the partnership funds of Cliff C. Wilson & Partners as reimbursement for their food and fuel expenses while living on the Oklahoma ranch.

### Seventh Count of Petition

In 1960, while the Oklahoma ranch owned by Cliff C. Wilson & Partners was under lease to Robert C. Miller, a severe wash occurred in a road on the ranch. The wash came to the attention of Cliff C. Wilson, although he was no longer living on the ranch. Mr. Wilson was of the opinion that the wash could be repaired for a relatively small amount if prompt action was taken, but that it would grow much worse in the absence of prompt action.

Mr. Wilson employed a man with a tractor to go on the ranch and repair the wash mentioned in the preceding paragraph. The cost of the road-repair job was $38.62. Mr. Wilson defrayed this cost personally, instead of paying it out of the partnership funds of Cliff C. Wilson & Partners.

In their joint income tax return for 1960, Cliff C. and Osie B. Wilson claimed a business deduction in the amount of $38.62 with respect to the cost of the road-repair job mentioned in this part of the opinion. The Wilsons also took for 1960 the standard deduction of $1,000 in lieu of itemizing their nonbusiness deductions.

On auditing the Wilson's income tax return for 1960, the Internal Revenue Service held that the Wilsons were not entitled to take as a business deduction the cost of the road-repair job in the amount of $38.62, although this amount could be included as a nonbusiness deduction if the Wilsons elected to itemize such deductions instead of taking the standard deduction of $1,000 for 1960.

The Wilsons elected to stand on their previous action in taking the standard deduction of $1,000 for 1960, rather than itemize their nonbusiness deductions and include a deduction in the amount of $38.62 with respect to the cost of the road-repair job on the Oklahoma ranch.

This was involved in a subsequent claim for refund, which the Internal Revenue Service disallowed.

The cost of repairing the wash in the road on the Oklahoma ranch owned by Cliff C. Wilson & Partners was obviously a partnership expense. The general rule is that such an expense should be deducted on the partnership income tax return in computing the net income of the partnership for the particular year, and, accordingly, that such an expense is not allowable as a deduction on the personal income tax return of a partner. Western Construction Co. v. Commissioner, 14 T.C. 453, 471 (1950); Klein v. Commissioner, 25 T.C. 1045, 1051 (1956).

An exception to the general rule mentioned in the preceding paragraph is recognized in a situation where, under a partnership agreement, a partner has been required to pay a partnership expense out of his funds. Under those circumstances, the partner is entitled to deduct the amount of such expense from his individual gross income. See Klein v. Commissioner, supra, at pages 1051–1052; Graham v. Commissioner, 35 T.C. 273, 278 (1960). In the present case, however, there is no evidence in the record tending to show that Cliff C. Wilson was required by the partnership agreement under which Cliff C. Wilson & Partners operated to defray the cost of the road-repair job on the Oklahoma ranch in 1960 out of his personal funds.

It is my opinion, therefore, that the Internal Revenue Service acted correctly in disallowing the business deduction in the amount of $38.62 which the plaintiffs Cliff C. and Osie B. Wilson took on their income tax return for 1960 with respect to the cost of the road-repair job on the Oklahoma ranch owned by Cliff C. Wilson & Partners.

### Eighth Count of Petition

In each of the years 1959, 1960, and 1961, Cliff C. Wilson drew disability retirement pay from the United States Navy on the basis of 100 percent disability as a retired lieutenant commander.

In their joint income tax returns for the three years mentioned in the preceding paragraph, Cliff C. and Osie B. Wilson did not claim any retirement income credit by virtue of the disability retirement pay received by Cliff C. Wilson for the respective years.

In March 1963, Cliff C. and Osie B. Wilson submitted to the Internal Revenue Service claims for refund with respect to the years 1959, 1960, and 1961, contending that Cliff C. Wilson was entitled to retirement income credit for each of these years by virtue of the disability retirement pay received by him. The claims for refund were disallowed by the Internal Revenue Service.

The defendant concedes in the present action that the plaintiffs Cliff C. and Osie B. Wilson are entitled to recover on the claim stated in the eighth count of the petition.

### Ninth Count of Petition

During the year 1960, Cliff C. Wilson & Partners received $900 as rental under the lease of the Oklahoma ranch to Robert C. Miller. The sum of $100 out of the $900 rental figure was distributed to Cliff C. Wilson as the owner of a one-ninth interest in Cliff C. Wilson & Partners.

In its 1960 partnership income tax return, Cliff C. Wilson & Partners reported as income the $900 referred to in the preceding paragraph.

On their joint income tax return for 1960, Cliff C. and Osie B. Wilson reported as income a partnership distribution which included the $100 which Mr. Wilson had received from Cliff C. Wilson & Partners in connection with the distribution of the $900 rental among the partners, and the Wilsons also reported the $100 a second time.

Cliff C. and Osie B. Wilson filed a timely claim for refund of income tax for 1960, asserting that there was double taxation on the $100 previously mentioned. The Wilsons' claim was disallowed by the Internal Revenue Service.

The defendant concedes in the present action that the plaintiffs Cliff C. and Osie B. Wilson are entitled to recover on the claim set out in the ninth count of the petition.

### Tenth Count of Petition

In the tenth count of the petition, the plaintiffs assert that they are entitled to interest on any income tax refunds that they may recover in the present action.

This is authorized by 26 U.S.C. § 6611.

### Affirmative Defense

The defendant asserts as an affirmative defense that the plaintiff Martha E. Robinson is not entitled to recover any income tax for the year 1958 because her claim for 1958 that is involved in the present action was not timely filed with the Internal Revenue Service.

As Mrs. Robinson's claim for 1958 is presented in the first count of the petition, the previous discussion of that count renders unnecessary any discussion of the defendant's affirmative defense.