LOUIS DEMPF, JR. AND STELLA M. DEMPF, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Dempf v. Commissioner
Docket No. 15363-79.
United States Tax Court
T.C. Memo 1981-720; 1981 Tax Ct. Memo LEXIS 26; 43 T.C.M. (CCH) 138; T.C.M. (RIA) 81720; December 21, 1981. Louis Dempf, Jr., pro se. Bradford A. Johnson, for the respondent. FORRESTER
MEMORANDUM FINDINGS OF FACT AND OPINION FORRESTER, Judge: Respondent has determined a deficiency in petitioners' Federal income tax for the calendar year 1976 in the amount of $ 8,562.48. The issues for decision are whether petitioners *27 sustained a loss in 1976 as a result of certain transfers to Towne Kar Kare, Inc., and if so, whether it is capital or ordinary. FINDINGS OF FACT Some of the facts have been stipulated and are so found. Petitioners are husband and wife who resided in Delmar, New York, at the time the petition herein was filed. They timely filed their joint Federal income tax return for 1976 with the Internal Revenue Service at Albany, New York. Stella M. Dempf is a party to this proceeding solely by virtue of having filed a joint income tax return with her husband; consequently, Louis Dempf, Jr., will hereinafter be referred to as petitioner. Petitioner is an attorney with offices in Labany, New York. Since entering the private practice of law in 1955 petitioner has concentrated his efforts on the legal affairs of small businesses. It was his usual method of operating to assist individuals interested in going into business with the formation and development of their proprietorship, partnership or corporation. Petitioner would usually not charge a fee for the time he devoted to a fledgling company in hope that as the company grew and prospered he would be retained to handle their legal *28 affairs for a fee. He was continually ready, willing and able to be a corporate officer or director, as well as to devote time to the actual operation and management of a business interprise. Petitioner believes that this had been a rewarding way in which to conduct his legal practice. In 1968 or 1969, petitioner was approached by Bill and Bob Webb (hereinafter sometimes referred to as the Webbs) who sought to begin a carwash business. Petitioner assisted them by looking for a location, checking zoning, and ultimately negotiating the purchase of an existing carwash. Petitioner did not charge the Webbs a fee for these services. In November 1969, petitioner helped the Webbs form a corporation to own and operate the carwash--Towne Kar Kare, Inc. (hereinafter TKK). TKK finalized the purchase of the Woodlawn Car Wash in March 1970 for $ 72,000. At that time each of the Webbs owned 10 shares (50 percent) of TKK stock. Petitioner was then the secretary of TKK and on its board of directors, but he did not own any stock therein. By August 1970, TKK had run into financial difficulties. On August 4, 1970, petitioner accepted the Webbs' offer to purchase 10 shares (one-third interest) *29 of TKK for $ 2,000. The business, however, continued to lose money. For its taxable years ending September 30, 1972, through September 30, 1976, TKK incurred net losses of $ 23,651.30, $ 6,310.06, $ 10,939.20, $ 15.56, and $ 4,443.43, respectively. [1] In order to operate notwithstanding these losses, TKK, through petitioner's contacts, borrowed heavily from local financial institutions with which he had longstanding relationships. Additionally, the petitioner personally made the following payments to or on behalf of TKK: Payee
Date
Amount
Harvey Segal
8/14/70
$ 400.00
TKK, Inc.
12/10/70
350.00
TKK, Inc.
1/7/71
2,650.00
State Tax Commission
4/22/71
2,650.00
TKK, Inc.
9/24/71
1,500.00
TKK, Inc.
8/25/71
1,000.00
TKK, Inc.
8/3/71
1,000.00
TKK, Inc.
5/19/71
2,000.00
Duren Sales Corp.
10/19/72
1,400.00
Cash
10/26/72
1,000.00
Heartland Leasing
10/31/72
1,319.99
Heartland Leasing
11/3/72
1,319.99
NYS Tax Commission
11/21/72
470.55
NYS Tax Commission
11/21/72
299.60
TKK, Inc.
10/30/72
1,000.00
TKK, Inc.
1/27/72
2,000.00
TKK, Inc.
1/10/72
2,000.00
TKK, Inc.
6/2/72
2,000.00
William Webb
6/30/72
104.86
City of Schenectady
12/22/72
5,579.15
Heartland Leasing
1,319.99
TKK, Inc.
1/8/72
200.00
Niagara Mohawk
12/27/72
884.04
National Legal Supply
1/8/73
80.35
Niagara Mohawk Power
2/23/73
1,144.32
Corp.
William Webb
4/25/73
1,462.14
Chris Dempf
6/14/73
56.00
Niagara Mohawk Power
7/10/73
1,027.50
Corp.
Cash
8/4/73
10.00
TKK, Inc.
?/5/73
35.00
L. Dempf, D. Burns,
8/31/73
10.00
W. Webb, d/b/a
Towne Associates
Mark Dempf
11/5/73
43.00
Towne Associates [2]
12/5/73
2,700.00
Towne Associates
12/31/73
1,500.00
*30 Petitioner made no payments to or on behalf of TKK after 1973. Petitioner claims that all of the checks dated 1970, 1971 and 1972, and $ 3,777.97 of the checks dated 1973 constitute loans in the total sum of $ 36,306.49 made by him to TKK. No promissory notes were ever given by TKK to petitioner, no interest was ever agreed upon or paid on these alleged loans, and petitioner held no security for repayment. There were no corporate resolutions which authorized or recognized petitioner's payments as loans. The corporate balance sheets of TKK, which were routinely checked by independent accountants, reflected loans from petitioner of only $ 21,500 for the period ending September 30, 1973. In the summer of 1976 the shareholders of TKK decided to terminate the business. Although it was intended to take place in late 1976, final disposition of TKK and/or its assets took place on January 15, 1977. TKK never went into either receivership or bankruptcy. By a letter dated April 13, 1977, attached to petitioner's 1976 Federal income tax return, Michael Costello, an associate attorney in the law *31 firm of which petitioner was a partner, determined that TKK then had $ 50,000 of liabilities, no assets, and was insolvent. He concluded that petitioner's loans to TKK were therefore uncollectible. On his Federal income tax return for 1976, petitioner claimed a business bad debt deduction in the amount of $ 36,306.49 as a result of payments to and on behalf of TKK made between 1970 and 1973, which had become uncollectible in 1976. In his notice of deficiency respondent has disallowed this deduction on the following grounds: (1) petitioner has not established that his payments to TKK were in fact loans; (2) if the payments were loans, they represent a nonbusiness bad debt which has not been established as becoming worthless or uncollectible during 1976. OPINION Although there seems to be some dispute between the parties as to the precise figures, the parties appear to be in agreement that petitioner did transfer substantial amounts of money to TKK and to others on its behalf. The primary concern of the parties, particularly the petitioner, throughout this litigation has been the nature of those transfers as either debt or equity of TKK. The petitioner's evidence has concentrated *32 on matters tending to prove that the payments were loans and that they were made primarily as an integral and necessary part of his legal practice. Petitioner thus concludes that since these loans became uncollectible in 1976, he is entitled to a business bad debt deduction for that year. Sec. 166(a)(1). [3]
Respondent, on the other hand, insists that the petitioner's payments represent an equity investment in TKK. Alternatively, respondent argues that if the transfers were loans, they were investment-related nonbusiness debts, deductible, if at all, subject to the limitations of section 166(d)(1)(B). Moreover, it is the government's position that even if the petitioner's payments were loans he has failed to show that they became uncollectible or worthless during 1976, thus precluding any deduction whatsoever. Assuming arguendo that petitioner's payments to TKK represent loans, whether they are of a nature potentially deductible as business bad debts under section 166(a) or as nonbusiness bad debts under section 166(d), *33 to be deductible in 1976 they must be shown to have become worthless during that year. The determination of worthlessness requires a "practical approach," looking to all the facts and circumstances both objective and subjective. Boehm v. Commissioner, 326 U.S. 287 (1945). Furthermore, it is the burden of the petitioner to establish that the asserted loss occurred in the year in which he claimed it. Boehm v. Commissioner, supra; Welch v. Helvering, 290 U.S. 111 (1933); Rule 142(a), Tax Court Rules of Practice and Procedure. Thus, not only must petitioner herein show that his loans had no value by the end of 1976, but he must also show that they did have value at the beginning of that year which, due to subsequent events, diminished to nothing. Wilson v. United States, 179 Ct. Cl. 725, 376 F. 2d 280 (1967); Hoover v. Commissioner, 32 T.C. 618 (1959). Upon our review of all of the facts and circumstances presented we are of the opinion that petitioner has failed to establish either that the alleged loans had some value at the beginning of 1976 or that they had no value by the end of that *34 year. In essence we have no more than petitioner's bare statements that his loans were uncollectible as of December 31, 1976. This is not enough to establish the loss. Hoover v. Commissioner, supra at 630. Additionally, he made no effort to show that the loans had value as of the beginning of 1976 or, for that matter, at any time after 1973. Petitioner testified that sometime in the summer of 1976 he and Bill Webb decided to "transfer out and sell out all of the facilities and what-have-you to other parties" but that "it didn't actually get closed or transferred until January 15, 1977." He failed, however, to enlighten this Court as to what those facilities were, to whom they were transferred, and for what consideration. Moreover, TKK's Federal corporate income tax returns (Form 1120) for 1973 through 1976 signed by petitioner contained blank balance sheets (Schedule L). No corporate books or other evidence has been presented from which we can determine TKK's net assets either at the beginning or the end of 1976. Petitioner also testified that he did not loan TKK additional funds after 1973, but the record is devoid of any explanation for the sudden discontinuance *35 of loans. Taken together these facts could indicate that petitioner sustained a loss in 1974 or 1975 as much as they could for 1976. The fact that petitioner is an attorney, that he is apparently aware of his burden of proof herein, and that he is seemingly in control of evidence which would answer these substantial factual questions, gives rise to a presumption that if such evidence were provided it would be unfavorable to his cause. Giddio v. Commissioner, 54 T.C. 1530, 1535 (1970). Petitioner relies almost entirely on his letter from Michael Costello, an associate in the law firm of which petitioner is a partner, for his assertion of worthlessness of the loans in 1976. We place very little weight on this evidence. Not only was Costello presumably under the control of petitioner, given their employee-employer relationship, but the associate was not produced at trial so that the method upon which he reached his conclusions could be explored on cross examination. Also, without knowledge of TKK's assets and the capital contributions of its shareholders, the fact that TKK had accumulated losses of in excess of $ 100,000 is meaningless. Although we have no reason *36 to dispute that petitioner honestly believes that he sustained a loss in 1976, that belief alone is insufficient to carry his burden. See Boehm v. Commissioner, 326 U.S. 287 (1945). Consequently, having found that petitioner has failed to prove worthlessness in 1976, and due to the possibility that petitioner may seek to raise the issues presented herein for a different taxable year not currently before the Court, we should not and do not express any opinion as to the nature of petitioner's payments to TKK as equity, business debts or nonbusiness debts. To reflect the foregoing, Decision will be entered for the respondent. Footnotes
1. TKK experienced net losses for its years ending September 30, 1970 and 1971, in the respective amounts of $ 19,203.46 and $ 39,030.21.↩
2. Towne Associates was a partnership formed by the shareholders of TKK in 1973.↩
3. Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954, as amended and in effect during the taxable year in issue.↩