*Decision will be entered under Rule 50.*

ALICE DUPONT ORTIZ AND JULIEN ORTIZ, HUSBAND AND WIFE, PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 93159. Promulgated June 21, 1940.

*Simon F. McHugh, Esq.,* and *William L. Hennessy, Esq.,* for the petitioners.

*R. P. Hertzog, Esq.,* for the respondent.

## OPINION.

ARNOLD: The first question presented for determination is the nature of sales of stock made through the short account at times when the petitioner held an equal or greater number of shares of the same kind in her long accounts. The respondent included in the dividend income for 1934 and 1935 the amounts credited as dividends to the petitioner's long accounts during those years.[1] The petitioner concedes that, as a general rule, dividends so credited constitute taxable income. She contends that the sales made through the short account are ordinary sales, that the dividend credits are mere book entries and do not represent dividends, and that they should be reduced by the amounts charged as dividends to the short account in order to determine the actual dividend income.[2] She further contends that she was engaged in the business of buying and selling securities and commodities, and that, should we hold the sales in question to be short sales, she should be permitted to deduct all of the dividends charged to her short account as ordinary and necessary expenses of that business.[3] The respondent contends that the sales were short sales, that the petitioner was not engaged in the business of buying and selling securities, and that the dividends charged to the short account constitute additions to the cost or other basis of the stock to be used in computing gain or loss upon the covering of the short sales.

The effect of a short sale is to create a debt in terms of goods (stock). The chief difference between a regular sale and a short sale is that, in the former the seller delivers his own shares to the purchaser and thus closes the transaction, while in the latter he delivers borrowed shares and the transaction is not closed so far as

---

[1] The respondent included $146,008.60 in the income for 1934 and $23,922.50 in the income for 1935. It is stipulated that the correct amount of the credits for 1934 is $146,017.35.

[2] The petitioner claims that of the dividends charged the amounts to be used as offsets are $145,338.60 for 1934 and $23,470 for 1935.

[3] The amounts charged to the short account were $145,958.60 for 1934 and $25,128.75 for 1935.

the seller is concerned until he delivers shares to repay the "loan." If the shares sold are not furnished by the seller at the time of sale but are supplied by the broker, the transaction is a short sale. *Frances Bartow Farr, Executrix*, 33 B. T. A. 557.

The respondent argues that the present case is controlled by the *Farr* case and by *DuPont* v. *Commissioner*, 98 Fed. (2d) 459; certiorari denied, 305 U. S. 631; and *Henry F. duPont*, 38 B. T. A. 1317; affd., 110 Fed. (2d) 641. Each of those cases clearly shows that the broker executed the order as a short sale, and an obligation was created to deliver stock in repayment of stock used or borrowed by the brokers, and such obligation was discharged by the delivery or transfer at a later date of like shares which, at the time of the sale, were in the possession of the seller or held in his long accounts. If, as the respondent says, delivery to the purchasers in this case was made from shares belonging to the brokers or their customers or from shares borrowed from other brokers, the sales clearly would be short sales. However, the facts are otherwise.

The orders were executed on the exchange in the regular way and delivery to the purchasers was made on the next full business day from certificates in street names held by the New York correspondents for Laird & Co. It is true that the shares so delivered were not identifiable by certificates as shares belonging to the petitioner, but they necessarily included shares held by the brokers for the petitioner. The understanding between the petitioner and the brokers, the mode of operation, and the manner in which the transactions were reflected on the brokers' records demonstrate that the deliveries were in effect deliveries from the petitioner's long accounts. None of the sales orders were labeled as short sales. It was the practice of the brokers, whenever the petitioner's long accounts contained no shares of the kind sold, to execute the sale as a short sale, with the usual marginal requirement, the charge for the short sale tax, and the delivery from borrowed stock. The proceeds were credited in such cases but were held by the brokers for the protection of the lender. The petitioner concedes that such transactions appeared in the short account and were short sales, but they are not here involved. We are here dealing with shares where those in the long account exceeded those in the short account. In every instance where the long accounts contained shares equal to or greater in number than those sold, it was the practice of the brokers, acting under authority to treat all accounts as a unit, to treat the sales made through the short account as sales of the petitioner's long shares. They required no margin and charged no short sale tax. They credited the short account with the proceeds, made an entry therein showing delivery of the shares, and made entries in the

long accounts reducing the number of shares held therein by the number sold through the short account. All of this was done at the time of the execution of the sale to the purchaser. Interest was allowed on the proceeds. That delivery from the long account was made at the time of the sale is established by the testimony of two employees of Laird & Co. who handled the stock records and dividend collections, and it is further corroborated by what was done when Laird & Co. took over the petitioner's accounts on October 1, 1932. Laird, Bissell & Meeds did not transfer to Laird & Co. the total shares in the long accounts and an outstanding obligation to repay the shares having a short status, but merely delivered the net number of shares. The witnesses further testified that in every case where the long position exceeded the short position the broker did not borrow any stock from other brokers or other customers for the purpose of delivery.

The evidence further shows that the brokers collected dividends only on the number of shares actually held for their customers, which consisted of the difference between the shares appearing on their books in long accounts and the shares appearing in the short accounts. They credited the petitioner with dividends on the number of shares shown in her long accounts and charged her with dividends on the number shown in her short account, but in those instances where her long position equaled her short position no dividends were collected or available for the petitioner. We think that the sales in question were intended to be and were actually executed as ordinary sales, or sales of shares held in the petitioner's long accounts. See *James Cunningham*, 29 B. T. A. 717; *C. B. Ferree*, 32 B. T. A. 725; affd., 84 Fed. (2d) 124; *Dee Furey Mott*, 35 B. T. A. 195; affd., *Commissioner* v. *Mott*, 103 Fed. (2d) 1009; *C. R. Dashiell*, 36 B. T. A. 313; affd., 100 Fed. (2d) 625. Cf. *William R. Tracy*, 38 B. T. A. 1366. The true dividend income, therefore, should be determined by offsetting against the dividend credits the amounts of $145,338.60 for 1934 and $23,470 for 1935.

As indicated above, the petitioner urges that the entire amounts charged as short dividends constitute ordinary and necessary business expenses. She claims a deduction of those amounts only in the event of a holding that the sales in question were short sales. In considering the second issue herein, we have concluded upon the evidence that the petitioner was engaged in the buying and selling of securities as a business. By reason of that fact, the petitioner would be entitled to deduct the short dividends as ordinary and necessary business expenses. *Dart* v. *Commissioner*, 74 Fed. (2d) 845, and the rule requiring that they be treated as additions to the cost or other basis of the stock sold, as set forth in *Gladys G. Terbell et al., Executors*,

29 B. T. A. 44; affd., 71 Fed. (2d) 1017; *Henry F. duPont, supra,* would not apply. Cf. *Deputy* v. *duPont,* 308 U. S. 488. Therefore, if we are in error in failing to hold the sales to be short sales, the petitioner's alternative claim would be valid.

The second question presented for determination is whether the petitioner is entitled to deductions of the amounts paid to her brokers as commissions on sales of securities and commodities. The Circuit Court of Appeals for the Second Circuit held in *Winmill* v. *Commissioner,* 93 Fed. (2d) 494, that commissions paid on purchases and sales of securities are deductible under section 23 (a) of the Revenue Act of 1932, provided the taxpayer was engaged in purchasing and selling securities as a business. That case was taken to the Supreme Court on the sole question of the deductibility of commissions on purchases, and it was held that such commissions are not deductible even by a trade, 305 U. S. 79.[4] The Circuit Court of Appeals thereafter announced its adherence to its decision in the *Winmill* case in so far as it involved commissions on sales. *Neuberger* v. *Commissioner,* 104 Fed. (2d) 649. If the petitioner's activities constituted a trade or business, she is entitled under the authority of the *Winmill* and *Neuberger* cases to deduct commissions.

An investor may be considered to be carrying on a business "if the transactions concerning his investments are substantial and frequent as distinguished from occasional or isolated." *Miller* v. *Commissioner,* 102 Fed. (2d) 476. Whether his activity constitutes a trade or business has been variously answered under various circumstances, and must be viewed in the light of the facts involved in each case. We have pointed out that the decisions turn upon whether the taxpayer's activities are those of what is styled a "passive investor", doing only what is necessary from an investment point of view, or whether they go beyond that point and involve active association in the enterprises in which he is financially interested or devotion of a substantial part of his time to such work as a matter of business. *Eugene Higgins,* 39 B. T. A. 1005; affd., *Higgins* v. *Commissioner,* 111 Fed. (2d) 229. In the recent case of *Sam J. Reckford,* 40 B. T. A. 900, we said that the extent of the market operations may be an important factor in determining whether or not the taxpayer is merely a passive investor, but beyond that point the extent of such activities tends only to define the difference between a large and a small trade or business, and that a factor of more decisive importance than the volume of transactions lies in whether or not the market activities consisted in dealing for speculative purposes or for investment purposes. In some cases emphasis

---

[4] The petitioner in the present case accordingly has abandoned her claim to a deduction of commissions paid on purchases.

is placed upon the amount of time devoted to the business. In others it is said to be a factor but not conclusive. In many of them the factor of time is not mentioned and the conclusions are rested entirely on the volume and number of transactions entered into during the year.

The facts herein show that petitioner was a housewife and had income from trusts and other sources. Her business activity was confined exclusively to the purchase and sale of stocks and commodities through her brokerage accounts. It was not limited to doing merely what was necessary from an investment point of view. The transactions were substantial and frequent rather than occasional or isolated. They were not limited in number or confined to a single security, as in the *Henry F. duPont* and *Terbell* cases. The purchases and sales ranged from 15,000 to 190,000 shares annually, involving a total cost or selling price of from $500,000 to $6,0000,000, and the petitioner's books and those of the broker reflect dealings in a variety of securities and the handling of many transactions in the course of a single day. They show purchases and sales, in most instances, in lots of from 100 to 500 shares, made regularly and continuously throughout the taxable years.

The petitioner's purpose, as indicated by the transactions reflected on the brokers' records, and as testified to by her, was to buy and sell for profit. She was an active trader and made many short sales. She gave active attention to all purchases and sales. She consulted Ellis, Weymouth, and Jones and relied to a large extent upon their advice. She studied market reports and financial periodicals. The less important transactions were entered into without first consulting her, but they were afterwards brought to her attention and approved. In most instances, and particularly during the taxable years, she directed the purchases and sales to be made. She spent time at the brokers' offices, and regularly held consultations with her agents at her home and by telephone every day, except for brief periods when she was abroad. While these matters required but an hour or two each day, we think this is unimportant in view of the extent and purpose of her operations. The petitioner's activities constituted the carrying on of a trade or business within the meaning of section 23 (a) of the Revenue Act of 1934. *Ignaz Schwinn*, 9 B. T. A. 1304; *E. M. Elliott*, 15 B. T. A. 494; *Richard D. Wyckoff*, 19 B. T. A. 263; *William A. Hodgson*, 24 B. T. A. 256; *George P. Sacks*, 25 B. T. A. 415; affd., 66 Fed. (2d) 308; *Harriet Pullman Schermerhorn*, 26 B. T. A. 1031; *J. A. Dart*, 29 B. T. A. 125; *L. T. Alverson*, 35 B. T. A. 482; *Austin D. Barney et al., Executors*, 36 B. T. A. 446; *Cornelia W. Roebling*, 37 B. T. A. 82; *Harry H. Neuberger*, 37 B. T. A 223; modified and affirmed, 104

Fed. (2d) 649; *Eugene Higgins, supra; Foss* v. *Commissioner*, 75 Fed. (2d) 326; *Winmill* v. *Commissioner, supra; Miller* v. *Commissioner, supra; Kales* v. *Commissioner*, 101 Fed. (2d) 35; *In re Mackey*, 110 Fed. 355; *John Marsch* v. *Commissioner*, 110 Fed. (2d) 423.

The final question is whether the petitioner is entitled to any deduction as a result of the satisfaction of the deficit existing in her husband's brokerage accounts at the end of the year 1934. The petitioner claimed a deduction in her return of $163,781.83 for a debt ascertained to be worthless and charged off in that year. She now concedes that this amount should be reduced by the value of the summer residence conveyed to her ($25,000) and the value of the Kendall stock transferred to her regular account ($890), which leaves a balance of $137,891.83.

We understand respondent's argument to be that the satisfaction of the deficit in Julien Ortiz's accounts under the contract of guaranty did not create a debt. He denies the existence of a debt because, he says, under the evidence a gift was intended. On the contrary, we think the evidence establishes the lack of any donative intent. Prior to the market crash Julien Ortiz's stock market transactions had been profitable, and his wife believed that profitable operations in his accounts would be resumed. Before executing the contract of guaranty she consulted with her financial adviser and her husband, who assured her that she would suffer no loss under the guaranty. Each of them believed that the market would go up and there would be no occasion to respond under the contract of guaranty. If the wife had been motivated by a donative intent, there would have been no hesitancy. She would have been ready and willing to give her husband any necessary funds. That no such donative intent existed is demonstrated by her act in taking over the security remaining in his accounts and requiring him to convey to her the real property in his name. These acts are inconsistent with donative intent. Cf. *Elizabeth N. C. Hetherington*, 20 B. T. A. 806; *Edward H. Moore*, 22 B. T. A. 366; appeal dismissed, 59 Fed. (2d) 1069; *William M. Fleitmann, Jr., et al., Executors*, 22 B. T. A. 1291; *Roy Nichols*, 17 B. T. A. 580.

Furthermore, respondent's argument ignores the legal consequences that flow from the contract of guaranty. Where a guarantor is forced to answer for the debt or default of another the law implies a promise on the part of the principal debtor to reimburse his guarantor. *Howell* v. *Commissioner*, 69 Fed. (2d) 447, and cases cited; certiorari denied, 292 U. S. 654. When Alice duPont Ortiz was forced to respond under her guaranty, the law implied a promise by Julien Ortiz to reimburse her. The guarantor's payment did not extinguish the debt; it merely substituted the guarantor for the

creditor, and thereafter she was entitled to assert any rights that the creditor may have had against the principal debtor or against any security held for the debt, 24 American Jurisprudence 955; 60 Corpus Juris 740, and the facts show that she exercised the rights so acquired against the principal debtor and against the security held for the debt. As a matter of law, therefore, a debtor-creditor relationship existed between husband and wife immediately upon her payment of the deficit in his accounts pursuant to her contract of guaranty.

The facts and circumstances under which this debt was created are so similar to the facts and circumstances existing in *Shiman* v. *Commissioner*, 60 Fed. (2d) 65, and the arguments advanced in the two cases are so alike, that a detailed analysis of the Circuit Court's decision will be helpful in disposing of the present issue. In July 1920 Shiman guaranteed a brokerage account of his brother-in-law, Oppenheim, who was speculating in stocks. At the time Shiman guaranteed the account Oppenheim was solvent, but thereafter he fell into financial straits and became insolvent. In October 1924 the brokers forced Shiman to pay $10,000 into the account under his guaranty in order to keep the account open for the balance of the year. In 1925 the account was closed out and Shiman had to pay an additional sum of more than $26,000 under his guaranty. In his 1924 return Shiman claimed the $10,000 payment as a loss, or a worthless debt, but the Commissioner and this Board denied the deduction. The Circuit Court, however, reversed. The Commissioner's argument, that the payment created no debt because it was a gift, was rejected, as was the argument that in any event Shiman was entitled to no deduction because the debt was worthless the moment it arose, as Oppenheim was then insolvent and known to be. The court likewise rejected the argument that until the account was closed out the debt was not ascertained to be worthless, and the argument that the charge-off was insufficient.

The respondent relies upon our decisions in *J. Edgar Davidson et al., Executors*, 26 B. T. A. 754, and *Florence O. R. Lang et al., Executors*, 32 B. T. A. 522, as controlling in the present issue. In the *Davidson* case we considered the *Shiman* case, *supra*, and distinguished it upon the ground that a substantially different situation was presented by the latter case. Factually, the instant proceeding is much nearer the *Shiman* case than the *Davidson* case. The *Lang* decision is distinguishable on its facts and is not, in our opinion, applicable.

The present facts are more nearly comparable to the situations which existed in *H. Rodney Sharp*, 38 B. T. A. 166; *Daniel Gimbel*, 36 B. T. A. 539; *Whitcher* v. *Welch*, 22 Fed. Supp. 763; and the *Shiman* case, *supra*. These cases hold that a taxpayer is entitled to deduct

as a worthless debt an amount paid under a guaranty where the principal debtor was unable to reimburse the guarantor. The principal debtor here was clearly unable to reimburse the guarantor except in the amounts shown, and in view of the cited authorities we hold that respondent erred in disallowing the deduction to the extent of the reduced amount thereof.

Reviewed by the Board.

*Decision will be entered under Rule 50.*

MURDOCK, concurring: The petitioner's brokerage accounts were combined in such a way that the sales involved in the first issue were not accounted for as short sales. Those sales were not made as short sales have to be made on the Exchange. It follows that they were not short sales. It is immaterial here that they were partially accounted for in an account called a short account.

MELLOTT concurs in the above.