**Samuel B. LEVIN and Gertrude Levin**

v.

**The UNITED STATES.**

**No. 39–77.**

United States Court of Claims.

April 18, 1979.

---

William Sturner, Bethesda, Md., attorney of record for plaintiff.

David C. Hickman, Washington, D. C., with whom was Asst. Atty. Gen. M. Carr Ferguson, Washington, D. C., for defendant Theodore D. Peyser, Washington, D. C., of counsel.

Before FRIEDMAN, Chief Judge, and DAVIS and KASHIWA, Judges.

## OPINION

PER CURIAM:

This case comes before the court on defendant's motion, filed March 13, 1979, requesting that the court adopt, as the basis for its judgment in this case, the recommended decision of Trial Judge Roald A. Hogenson, Chief of the Trial Division, filed January 31, 1979, pursuant to Rule 134(h), as the basis for its judgment in this case, plaintiff having filed no intent to except thereto, and the time for so filing pursuant to the Rules of the court having expired. Upon consideration thereof, without oral argument, since the court agrees with the trial judge's recommended decision, as hereinafter set forth,* it hereby grants defendant's motion and affirms and adopts the recommended decision as the basis for its judgment in this case. Therefore, it is concluded as a matter of law that plaintiff is not entitled to recover, and the petition is dismissed.

---

* Although the court adopts the trial judge's separate findings of fact which are set forth in his opinion, they are not printed herein since such facts as are necessary to the decision are contained in his opinion.

1. "§ 166 Bad debts.
   "(a) General rule.—
   "(1) Wholly worthless debts.—
   "There shall be allowed as a deduction any debt which becomes worthless within the taxable year.

       *    *    *    *    *    *

   "(d) Nonbusiness debts.—
   "(1) General rule.—
   "In the case of a taxpayer other than a corporation—
   "(A) subsections (a) and (c) shall not apply to any nonbusiness debt; and
   "(B) where any nonbusiness debt becomes worthless within the taxable year, the loss

## OPINION OF TRIAL JUDGE

HOGENSON, *Trial Judge*: This case arises out of a partial disallowance of a claim for refund of federal income taxes paid for taxable year 1967 based on a carryback from net operating loss incurred in 1970. Three issues are presented: (1) whether taxpayer's extensive buying and selling of securities on the stock market constitute a "trade or business" within reach of section 166, the business bad debt provision of the Internal Revenue Code of 1954;[1] (2) whether a loan to another stock investor allegedly made to prevent sale of his holdings in a particular corporation in which taxpayer had a substantial stock investment, was a "business" debt for purposes of section 166; and (3) whether or not the loan in fact became worthless within the claimed year.

This case turns on resolution of these three questions of fact. The issues presented have been extensively litigated and, consequently, there is considerable case law to guide recommended conclusions. For reasons to be discussed below, defendant must prevail.

From the time he was a young man, taxpayer Samuel B. Levin,[2] devoted virtually all his working time to the purchase and sale of securities. His initial investments

---

resulting therefrom shall be considered a loss from the sale or exchange, during the taxable year, of a capital asset held for not more than 6 months.
   "(2) Nonbusiness debt defined.—
   "For purposes of paragraph (1), the term "nonbusiness debt" means a debt other than—
   "(A) a debt created or acquired (as the case may be) in connection with a trade or business of the taxpayer; or
   "(B) a debt the loss from the worthlessness of which is incurred in the taxpayer's trade or business."

2. Gertrude Levin, wife of Samuel B. Levin, is a party to this action solely by virtue of the fact she and her husband filed joint federal income tax returns for the years in question. Subsequent reference to "taxpayer" in this opinion is therefore limited to Samuel B. Levin.

made during and immediately following World War II brought him substantial profits. Although he frequently purchased heavily in the stock of one company or another, he was generally active in purchases and sales of stocks of various corporations. For instance, in 1961, the year of the indebtedness note in question, he conducted 332 transactions which represented the transfer of 112,400 shares with a total value of $3,452,125.

Routinely taxpayer visited the corporations in which he was interested and talked to company officers, traveling out of town for these visits when necessary. His days were frequently spent in the brokerage houses on Wall Street; he ate lunch with brokers at the Stock Exchange Club; and he attended lectures sponsored by securities analysts when the topics were of interest. He maintained ledger sheets of all his stock transactions, attended stockholders' meetings, and generally spent his time purchasing and selling securities on his own account.

It was taxpayer's practice to purchase to the extent of allowable margin. He traded with four to six brokerage houses in order to disperse his large number of shares in any one corporation, as many brokers prohibited concentrated holdings in their margin accounts. In addition, this practice avoided pressure to liquidate his entire investment in a particular company to meet a single broker's margin call. Prior to the market decline in late 1969 and early 1970, taxpayer was exceedingly successful in his stock transactions. In 1968, for instance, he held stock valued at nearly $8 million with a margin debt of approximately $3 million, leaving him a net worth of about $5 million. His only other source of income was $5,000 in salary for sitting on the board of directors of a small oil-producing company.

As early as 1950 taxpayer became interested in Central Railroad Company of New Jersey (hereinafter Central Railroad) and began purchasing its shares. By 1961 his holdings in this company amounted to almost 62,000 shares purchased at nearly $1.5 million. During the time he was increasing his Central Railroad holdings he met Irving Like (hereinafter debtor), a former stockbroker who was also trading on his own account, and shared taxpayer's interest in Central Railroad. A business friendship developed. In 1956, at taxpayer's suggestion and with his assistance, debtor was elected to the Board of Directors of Central Railroad, eventually becoming a member of the Executive Committee. In this capacity he provided a continuous source of information to taxpayer regarding Central's business, which taxpayer believed safeguarded his substantial holdings in this company.

Although these men had no social contacts beyond their business relationship, debtor borrowed $3,000 from taxpayer in 1957 to help pay for a daughter's wedding. The debt was repaid 6 months later when debtor's stocks went up in price and he was able to borrow on his margin accounts.

During 1960 debtor's wife underwent four cancer operations. In order to meet hospital and doctor expenses he again borrowed from taxpayer in a series of loans beginning in March: First a $3,000 loan, then three $1,000 loans, and finally a loan for $5,000 late in October 1960. A portion of the $5,000 loan was to be used to meet debtor's margin calls.

Almost a year later, July 1961, debtor received additional margin calls from his brokers. To meet these demands he borrowed $25,000 more from taxpayer. Approximately 1 month following the final loan, on August 28, 1961, debtor executed a demand note payable to taxpayer for $36,000, the total amount of the six unpaid loans. Debtor understood the purpose of the note was to allow taxpayer to collect from his estate in the event he died before repayment.

All of the loans, including the initial wedding loan in 1957, were without interest. The resulting note made no provision for interest. Taxpayer testified his orthodox religious beliefs prevented him from charging interest on any loan, business or personal. Apparently the series of loans to debtor were the only loans taxpayer ever made.

At no time did debtor make payment on any portion of the $36,000 loan and, in August 1967, the New York statute of limitations barred suit to enforce payment on the note.

At the time the loans were made, debtor held about 5,000 shares of Central Railroad, having increased such holdings from 2,700 shares which he held in 1956 when he became a director of that company. The 5,000 shares of Central Railroad represented the largest holding in debtor's stock portfolio. Taxpayer had already received one margin call himself regarding his Central Railroad stock and was concerned that without the loans debtor would sell his Central shares which would lower the market price and precipitate additional margin calls for taxpayer. Central Railroad went into receivership in 1967 and debtor was forced to sell his shares at a loss in order to meet living expenses. Taxpayer continued to hold his stock in this company, however, until 1970 when he was likewise forced to sell. At the time Central became bankrupt, taxpayer's net worth was approximately $5 million; and he did not need payment of the $36,000 note to meet personal expenses. Even with the rapidly declining market in late 1969 and early 1970, taxpayer had sufficient funds so that he did not need repayment of the loans until the fall of 1970 when he made a demand on debtor and asked him to sign a new note. At that time, both parties knew the statute of limitations had run on the original note and, although debtor hoped to be able to repay taxpayer at some point, he refused to renew the note. Debtor was concerned that should taxpayer die, he would be sued on the note by taxpayer's estate.

In seeking to carryback to 1967 net losses incurred in 1970, taxpayer made the following statement on his 1970 federal income tax return, schedule C:

In 1961 taxpayer in the course of his operation as a securities trader loaned Irving Like $36,000 for which he received a demand note. Mr. Like was also a substantial buyer and seller of securities and had been helpful to taxpayer in his securities trading activities. In 1970 when taxpayer had severe financial reversals, taxpayer requested payment. Mr. Like advised that he also was in financial distress, in ill health and could not and would not pay the note. Statutory period for taking court action to enforce collection expired and taxpayer had to write off the loan as a bad debt loss.

Taxpayer was allowed to carryback net operating losses from 1969 and 1971 to taxable years 1966 and 1968. Also, he was allowed to carryback to taxable year 1967 some of the business operating loss he incurred in 1970, but he was denied a refund of $13,847 in 1967 taxes for carryback from 1970 of the claimed business bad debt of $36,000. Taxpayer timely brought suit to recover this amount.

## I. Trade or Business

■ In order to claim a business bad debt loss under section 166 of the Internal Revenue Code, a taxpayer must establish that he is engaged in a trade or business and that the loss bears a direct relationship to that trade or business. 26 C.F.R. § 1.166–5 (1978);[3] *Townshend v. United States,* 384 F.2d 1008, 1010, 181 Ct.Cl. 635, 640 (1967).

---

3. "26 C.F.R § 1.166–5. *Nonbusiness debts.*

\* \* \* \* \* \*

"(b) *Nonbusiness debt defined.* For purposes of section 166 and this section, a nonbusiness debt is any debt other than—

\* \* \* \* \* \*

"(2) A debt the loss from the worthlessness of which is incurred in the taxpayer's trade or business. The question whether a debt is a nonbusiness debt is a question of fact in each particular case. \* \* \* For purposes of subparagraph (2) of this paragraph, the character of the debt is to be determined by the relation which the loss resulting from the debt's becoming worthless bears to the trade or business of the taxpayer. If that relation is a proximate one in the conduct of the trade or business in which the taxpayer is engaged at the time the debt becomes worthless, the debt comes within the exception provided by that subparagraph. \* \* \*"

Although the Supreme Court has yet to find a taxpayer properly characterized as a securities "trader," it is clear such a section 166 "businessman" exists, given the proper facts. *Higgins v. Commissioner of Internal Revenue,* 312 U.S. 212, 61 S.Ct. 475, 85 L.Ed. 783 (1941); *Snyder v. Commissioner of Internal Revenue,* 295 U.S. 134, 55 S.Ct. 737, 79 L.Ed. 1351 (1935); *Commissioner of Internal Revenue v. Nubar,* 185 F.2d 584 (4th Cir. 1950). By contrast the activity of a mere "invest[or] is not a trade or business." *Whipple v. Commissioner of Internal Revenue,* 373 U.S. 193, 202, 83 S.Ct. 1168, 1174, 10 L.Ed.2d 288 (1963). Neither the code, the regulations, nor the courts have yet provided a precise definition as to when an individual taxpayer's behavior is that of a trader rather than an investor in corporate stocks. According to *Higgins,* a factual analysis in each case is required to determine if a particular taxpayer's securities activities rise to the level of "carrying on a business." 312 U.S. at 217, 61 S.Ct. 475.

It has been ruled, however, that:

\* \* \* [A] taxpayer who, for the purpose of making a livelihood, devotes the major portion of his time to speculating on the stock exchange may treat losses thus incurred as having been sustained in the course of a trade or business. \* \* [*Snyder,* 295 U.S. at 139, 55 S.Ct. at 739.]

Establishing continuity of investment activity is not enough. The taxpayer must do more than "merely [keep] records and [collect] interest and dividends from his securities, through managerial attention for his investments." *Higgins,* 312 U.S. at 218, 61 S.Ct. at 478; *Wilson v. United States,* 376 F.2d 280, 293, 179 Ct.Cl. 725, 746 (1967). In effect, a "trader" is an *active* investor in that he does not passively accumulate earnings, nor merely oversee his accounts, but manipulates his holdings in an attempt to produce the best possible yield. That is, the trader's profits are derived through the very acts of trading—direct management of purchasing and selling. *Purvis v. Commissioner of Internal Revenue,* 530 F.2d 1332 (9th Cir. 1976); *Chiang Hsiao Liang,* 23 T.C. 1040 (1955).

Even absent a clear judicial demarcation between trader and investor, it is apparent that plaintiff taxpayer's securities activities place him close to the trader end of the spectrum. Aside from a small annual salary for sitting on the board of an oil-producing company, his entire and substantial income was derived from his trading. He devoted virtually his whole working day to his stock transactions, unlike the taxpayers in *Snyder* and *Wilson.* In contrast to the distant management of a portfolio portrayed in *Higgins,* judgments regarding purchases and sales were made directly by taxpayer, based on his personal investigation of the assets, operation and management of various corporations. In addition, the sheer quantity of transactions he conducted also supports a reasonable conclusion that this taxpayer's business was trading on his own account.

Defendant urges a narrowing of this issue to consideration of whether taxpayer's activities in regard to the particular stock he held in Central Railroad alone amounted to a "trade or business." While the courts do acknowledge that a trader (and even a "dealer") may hold simultaneously certain shares for investment purposes and others to trade, *e. g., Bradford v. United States,* 444 F.2d 1133, 195 Ct.Cl. 500 (1971), the question here is whether taxpayer was generally "carrying on the business" of trading for his own account. It is concluded that he was.

## II. *Business or Personal Loan*

The second step in claiming a section 166 business bad debt deduction is to establish that the loan was proximately related to the trade or business of the taxpayer. 26 C.F.R. § 1.166–5. The Supreme Court in *United States v. Generes,* 405 U.S. 93, 103, 92 S.Ct. 827, 31 L.Ed.2d 62 (1972), directed that the dominant motivation, not merely a significant motivation, must be business-related. Essentially this requires the court to make two factual determinations: First, that the loan was proximately related to

the taxpayer's business [4] and, second, that this proximate business relationship provided the dominant motivation for lending the money. *Hogue v. Commissioner of Internal Revenue,* 459 F.2d 932, 937 (10th Cir. 1972); *Oddee Smith,* 55 T.C. 260 (1970). In *Generes,* the Supreme Court reasoned:

> * * * By making the dominant motivation the measure, the logical tax consequence ensues and prevents the mere presence of a business motive, however small and however insignificant, from controlling the tax result at the taxpayer's convenience. This is of particular importance in a tax system that is so largely dependent on voluntary compliance. [405 U.S. at 104, 92 S.Ct. at 833.]

Clearly the standard is to be objective and not subjective. To this end, *Generes* specifically warns that self-serving statements alone will not suffice to prove a taxpayer's business purpose in advancing money. 405 U.S. at 106, 92 S.Ct. 827.

■ Taxpayer has difficulty meeting both components of the requirement. Aside from his own statements reflecting a belief that without the loan debtor would be forced to sell his Central Railroad stock, and a corresponding belief that such a sale would lead to detrimental margin calls from taxpayer's own brokers, the record is devoid of evidence to substantiate the proximate relationship and dominant motivation.

Objective facts tending to prove the business-relatedness aspect of taxpayer's claim are missing. Taxpayer fares no better in establishing the dual business motives he asserts underlie the loans: (1) to remove the need for debtor to sell his shares of Central Railroad stock and (2) to permit debtor to remain on the railroad's board of directors. It is not necessary to analyze defendant's elaborate arguments to the effect that debtor would not have sold his Central Railroad stock if faced with a need to liquidate some of his portfolio, for debtor himself testified that at the time the loans were made even he had not made the decision as to which of his holdings he would sell if he could not obtain the loans. In addition to his Central stock, he held shares in 10 other companies, which were more readily marketable. If these were truly business loans, it is difficult to understand why taxpayer did not attempt to ascertain which stock debtor actually would have sold, and the extent of debtor's holdings other than Central Railroad stock. Apparently taxpayer also made no attempt to secure a promise, either oral or written, from debtor that he would not sell his Central Railroad stock or that he would retain enough to remain a director, as a form of collateral security in support of the loans. The lack of any such business arrangements strongly indicates that the loans were primarily personal in nature.

Taxpayer did not treat these loans in what is traditionally thought of as a "businesslike" manner. The note was not executed until more than a year following the first advance of money, and debtor believed the sole reason for memorializing the debt was to allow taxpayer to recover from his estate in case of debtor's death. Although taxpayer explained the orthodox religious reasons which prevented charging interest on the loans, no business reason was suggested to explain why he did not undertake to have the debtor renew the note prior to the running of the statute of limitations in 1967. His explanation was a personal one that he did not need repayment until 1970. It does not aid taxpayer's claim that he had little or no need for the funds during that time. As the above quote from *Generes* reveals, provisions of the tax code are not

---

4. Pertinent legislative history provides:

"The character of the debt for this purpose is not controlled by the circumstances attending its creation or its subsequent acquisition by the taxpayer or by the use to which the borrowed funds are put by the recipient, but is to be determined rather by the relation which the loss resulting from the debt's becoming worthless bears to the trade or business of the taxpayer. If that relation is a proximate one in the conduct of the trade or business in which the taxpayer is engaged at the time the debt becomes worthless, the debt is not a nonbusiness debt for the purposes of this amendment." H.R.Rep.No. 2333, 77th Cong., 2d Sess. 77; S.Rep.No. 1631, 77th Cong., 2d Sess. 90. *See also Whipple,* 373 U.S. n.9 at 200–01, 83 S.Ct. 1168.

available merely at the convenience of the taxpayer.

When claiming a federal tax refund, the taxpayer bears the burden of proving the facts he asserts establish his right to recover. *United states v. Anderson,* 269 U.S. 422, 443, 46 S.Ct. 131, 70 L.Ed. 347 (1926); *Jones Bros. Bakery v. United States,* 411 F.2d 1282, 1293, 188 Ct.Cl. 226, 244 (1969). As the only evidence presented to show the loans were required to protect his own stock holdings is in the form of self-serving statements in the record, taxpayer has not met this burden.

The fact taxpayer and debtor had only a business relationship, founded on their mutual interest in a particular stock and exclusive of their wives and families, does not preclude a determination that taxpayer was primarily motivated by personal rather than business feelings when making the $36,000 loan. Obviously the taxpayer and debtor had developed a strong personal friendship, even though generated by business relations, as was evident from their demeanor as witnesses. It is found that the loans were not business in nature, but were to assist a business friend through a personally and financially difficult time.

### III. *Worthlessness of Debt*

Even if taxpayer had established his motive for making the $36,000 loan as dominantly business-related, he has not met the burden of showing the debt became worthless, and therefore deductible, during the 1970 tax year.

As with the prior two issues, we are again faced with resolution of what is primarily a question of fact. *Boehm v. Commissioner of Internal Revenue,* 326 U.S. 287, 294, 66 S.Ct. 120, 90 L.Ed. 78 (1945). This court has previously established a standard for determining the year of deductibility of a bad business debt:

> The plain language of this statutory provision [§ 166 of the Internal Revenue Code of 1954] obviously contemplates (1) the existence of a debt, (2) that the debt had value sometime during a taxable year, and (3) that the debt subsequently became worthless during the course of the taxable year. [*Wilson,* 179 Ct.Cl. at 742, 376 F.2d at 291.]

█ That the debt was bona fide and originally had value is not questioned by defendant, but the issue is whether it became worthless prior to taxable year 1970. Taxpayer has the burden not only to prove that the debt had intrinsic value at the beginning of 1970 and became worthless in that year, but also that throughout the entire life of the debt, the evidence reasonably available to him pointed out that it was possessed of some value and had not become wholly worthless. Taxpayer may strike a reasonable course between optimism and pessimism about collection of the debt, but as to when the debt becomes worthless, he must exercise sound business judgment upon as complete information as is reasonably available. *Minneapolis, St. Paul R.R. v. United States,* 164 Ct.Cl. 226, 240–41 (1964).

█ Taxpayer failed to prove that subject debt had any intrinsic value at any time in 1970. From the limited evidence presented, it appears that the debt became wholly worthless no later than 1967 when the statute of limitations ran. Plaintiff has not carried his burden of showing that the debt had any intrinsic value at any time thereafter.

█ It is true that taxpayer was not automatically required to claim a deduction for the debt in 1967 solely because that was the year the statute of limitations ran. In fact, the availability of a statute of limitations defense is not in itself a sufficient ascertainment of the worthlessness of a debt. *Nippert v. Commissioner,* 32 B.T.A. 892, 897 (1935). However, taxpayer does have the burden of showing that after the statute has run he has an objective and substantial reason for believing the note eventually will be paid. *Alexander v. Commissioner,* 26 T.C. 856, 863 (1956). Although taxpayer has stated he expected payment whenever he made demand on debtor, in light of the facts available to him at the time, this expectation does not comport with sound business judgment.

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

Taxpayer knew Central Railroad went into receivership in 1967 and that debtor was forced to sell his stock to meet personal living expenses. Taxpayer also knew debtor was in ill health and suffering severe financial difficulties prior to late 1969 or early 1970 when debtor moved to Florida. At no time did debtor make any payments on the note. Standing alone, the fact that taxpayer did not make a demand for repayment until 1970 is not determinative of the time when he knew or should have known the note had no value. *Smyth v. Barneson*, 181 F.2d 143, 145 (9th Cir. 1950).

▓▓▓ The proper measure of when a debt becomes worthless turns on the financial condition of the debtor and the circumstances relating to the debt—not on the affluence of the creditor. 26 C.F.R.

§ 1.166–2 (1978).[5] That taxpayer had no need of repayment of the $36,000 note prior to the 1970 tax year is irrelevant to a determination of when the debt actually became worthless.

## CONCLUSION OF LAW

Upon the findings and the foregoing opinion, which are adopted by the court, the court concludes as a matter of law that plaintiff is not entitled to recover and the petition is dismissed.

---

**5.** "26 C.F.R. § 1.166–2. *Evidence of worthlessness.*

"(a) *General rule.* In determining whether a debt is worthless in whole or in part the district director will consider all pertinent evidence, including the value of the collateral, if any, securing the debt and the financial condition of the debtor."