Frederick R. MAYER and Jan
Perry Mayer, Plaintiffs,

v.

The UNITED STATES, Defendant.

No. 92–389T.

United States Court of Federal Claims.

Sept. 28, 1994.

David Douglas Gustafson, U.S. Dept. of Justice, Tax Div. Claims Ct., Washington, DC, for defendant.

Claude Raymond Wilson Jr., Golden, Potts, Boeckman & Wilson, Dallas, TX, for plaintiffs.

### Order [1]

WEINSTEIN, Judge.

This case is before the court on defendant's motion pursuant to rule 12(b)(4) of the Rules of the United States Court of Federal Claims ("RCFC") to dismiss plaintiffs' complaint for failure to state a claim for which relief can be granted. This motion has been treated as a motion for summary judgment and is decided as provided in RCFC 56. *See* RCFC 12(b) (last sentence).

Plaintiffs contest the Commissioner of the Internal Revenue Service's (IRS) denial of plaintiffs' claim for a refund of income taxes and interest for the 1983, 1984, and 1985 tax years.

The only issue here is whether, as plaintiffs contend, Frederick R. Mayer [2] was engaged in a trade or business, specifically that of a "trader" in securities. If so, the expenses associated with his activity reduce his adjusted gross income (AGI), *see* Internal

---

[1] This case was decided on June 9, 1994. The order is being reissued for publication, with minor editorial changes not affecting the substance of the opinion, at the unopposed request of the government pursuant to RCFC 52.1(b).

[2] Plaintiffs are spouses filing joint tax returns. However, the refund claims indicate that only Frederick R. Mayer's activities are at issue. There are no allegations that Mrs. Mayer's activities constitute those of a trader. Plaintiff in the singular henceforth refers to Mr. Mayer only.

Revenue Code ("IRC")[3] § 62 (defining AGI), pursuant to § 162(a) of the IRC (permitting the deduction of trade or business expenses from AGI) and thus reduce the income subject to the alternative minimum tax (AMT), *see* IRC § 55 (imposing 20% tax on the excess of AMT income over the income upon which regular tax for the year is based). Also, this characterization of their expenses would entitle plaintiffs to a refund of excess AMT for those years. If, instead, Mr. Mayer's activities were merely those of an investor, as the government argues, the expenses are deductible in computing personal taxable income, pursuant to IRC §§ 211–212, but do not reduce plaintiffs' AMT, nor entitle them to any refund therefor.

## Background

Mr. Mayer incorporated Captiva Corporation ("Captiva") in December, 1982, to oversee money managers charged with investing certain of his assets, consisting of certain proceeds from the 1980 sale of the Exeter Company, an oil well drilling business, for $134.5 million, which included $23 million in cash, and two notes for $13 million each, both due within the next two years, and 1,767,748 shares of stock in a new corporation, People's Energy. The stock he received was sold over the next few years. Mr. Mayer was the sole shareholder and president of Captiva Corporation during the years at issue, receiving compensation totalling $85,000 in 1983, $81,458 in 1984, and $86,842 in 1985. Captiva was Mr. Mayer's only and full-time business. Captiva hired employees, paid rent, and acted as the corporate representative of all of the Mayer family's assets.

In managing Exeter, Mr. Mayer had hired several engineers, each to operate autonomously a separate group of oil well drilling rigs. Intending to give the money managers similar responsibilities, he hired "trained and experienced money managers with goals and autonomy to manage separate groups of assets," in order "to better manage risk."

(Mayer Aff., Pls.' App. at 2.)[4] Like Exeter, Captiva had an accounting office and hired Price Waterhouse to serve as advisor and auditor.

Dr. Katherine Cattanach ("Cattanach"), a full-time employee of Captiva during 1983, 1984, and 1985, located the external money managers and assisted Mr. Mayer in selecting them. Gloria Higgins handled Captiva's financial operations.

Dr. Cattanach and Mr. Mayer kept abreast of market conditions, read trade journals, and attended seminars, continuing education programs, and other meetings with those who trade in securities for their own account and others. Mr. Mayer held three retreats per year with the money managers, each retreat concentrating on a different aspect of asset management. (Cattanach Aff., Pls.' App. at 9).

The money managers were "carefully chosen to reflect one of a spectrum of [investment or asset management] approaches, thereby reducing risk over market cycles when all of them are taken together," and based on their "strong [investment] performance over time." (*Id.* at 11.) Each money manager was given a distinct sum of money to manage, which generally was placed in a custodian bank account specifically established for that money manager. A manager was paid a percentage (1/4% to 2%) of the value of his portfolio. Stockbrokers employed independently by the money managers effected the actual trades. The money managers were required to furnish quarterly reports of their transactions to Captiva, Dr. Cattanach, and Mr. Mayer. (*Id.* at 15.)

According to the terms of written agreements with the managers, the accounts the managers maintained for Mr. Mayer were discretionary in nature, each manager having sole and absolute discretion to make purchases and sales, and full investment control, without any "inhibiting restrictions." (Def.'s App. at 49, 58, 131, 138, 141, 145.) "The

---

3. All section references are to the Internal Revenue Code (26 U.S.C.) in effect during the years in issue, unless otherwise noted.

4. Def.'s App. refers to the appendix to defendant's motion to dismiss. Def.Resp. to Pls.' SGI refers to defendant's response to plaintiffs' statement of genuine issues. Pls.' App. refers to the appendix to plaintiffs' opposition to the motion to dismiss. Pls.' SGI refers to plaintiff's statement of genuine issues.

money managers made the actual investment decisions." (Cattanach Aff., Pls.' App. at 14.) Mr. Mayer's policy, stated in these signed agreements, was "[b]arring a disastrous or unusual occurrence [sic]," to give each manager three to five years to prove his capability. (Def.'s App. at 50, 60, 132, 143.)

Mr. Mayer used a form agreement stating that "the overriding goal ... is ... wealth maximization through *capital appreciation;* " that "pursuit of this goal will, on occasion, result in periods of relative illiquidity;" that "liquidity is not generally an issue;" and that, whenever a choice was to be made, "returns gained through *capital appreciation* are clearly to be preferred." [5] (Def.'s App. at 49–50.) (emphasis added) Plaintiffs stated goal was to obtain an annual return of 10% over and above inflation. (Cattanach Aff., Pls.' Aff. at 14.)

Plaintiffs describe the investment style of six of the nine money managers as follows: (1) Peter B. Cannell "typically hold[s] positions for long-term gains[;]" (2) Anderson, Hoagland blend "fixed income investments with equity investments to provide both cash flow and capital appreciation[;]" (3) Anton & Moore employ a "conservative bias[;]" (4) Burnham & Company's strategy "fit well with [plaintiffs'] ... investment focus on capital gains[;]" (5) Corinthian Capital invests in disfavored stocks, so that "the portfolio can appear to languish over extended periods of time ... [although] the long-term returns can be excellent[;]" and (6) J. Tirschwell & Loewy, like Corinthian Capital, "are value-based investors who buy on fundamentals, then hold on until other investors recognize

the underlying value driving the stock's price up." (Pls.' Ex. 12, Pls.' App. at 657–59.)

Plaintiffs point out that, excluding in-house sales,[6] 75%, 61%, and 59% of total sales in 1983, 1984, and 1985, respectively, represented short-term sales of securities. (Pls.' SGI at 12.) They also state that, in 1983, $9,643,867 of the gross proceeds came from such short-term sales (82%) and $2,101,904 from long-term gains (18%) (*id.* at 50, Pls.' Findings of Uncontroverted Fact at 25), and that in 1984 and 1985, gross proceeds from short-term gains were 61% and 62%, respectively. (*Id.*) However, the term "short-term" indicates only that the securities were held less than a year, and, further, does not indicate these securities were held less than thirty days. Of the $5,326,478 in income over three years, 83.8% of total income was derived from long-term appreciation, interest, and dividends ($2,737,051 in long-term capital appreciation plus $1,725,283 in interest and dividends, divided by $5,326,478). (Plaintiffs state that interest income of $931,899 is the "by-product of uninvested cash." (Pls.' SGI at 52.))

Plaintiffs have proffered no evidence that the managers were instructed to engage in short-term, speculative trading. (No affidavits were obtained from the managers.) The overwhelming majority of stocks sold for plaintiffs had been held for more than thirty days, as shown by the following table, the accuracy of which was not questioned by plaintiffs (*see id.* at 27), showing the holding periods for the stock sold by the money managers in those years (shown by number of sales for Mrs. ("JPM") and Mr. ("FRM") Mayer, respectively, as well as *in toto* ):

---

5. Plaintiffs assert that the statement regarding long-term appreciation is misleading because it was taken from an old (1981) agreement, but do not proffer any evidence corroborating the assertion that this agreement is not similar in all relevant respects to other agreements with the money managers. (*See, e.g.,* Def.'s App. 58–60, 131–33, 141–43.) The agreements provided by plaintiffs in discovery appear virtually identical. *See* RCFC 56(f), Appendix H. Those that do not follow the form agreement described here simply give the managers broad discretion and no specific direction regarding investment strategy. No agreement instructing a manager to engage in short-swing transactions is in the record. The suggestion that plaintiff verbally countermanded the instructions in these agreements also is not

supported by a proffer of evidence meeting the requirements of Appendix H to RCFC, *e.g.,* an affidavit from a money manager.

6. In-house transactions consisted of sales of blocks of stock in Exeter and related successor companies that were handled directly by Mr. Mayer, or by Gloria Higgins or Dr. Cattanach at his request. (Pls.' SGI at 3.) Plaintiffs allege that the expenses of those sales are not part of their refund claim. For purposes of this motion only, defendant and the court have accepted this allegation as true and disregarded such transactions in determining whether Mr. Mayer was acting as a trader.

| Days | JPM | FRM | Total |
| --- | --- | --- | --- |
| 30 − | 8 | 63 | 71 |
| 30 + | 156 | 625 | 781 |
| 365 + | 123 | 363 | 486 |
| | 287 | 1051 | 1338. |

Thus, the percentage of sales transactions involving stock held less than thirty days was 71 divided by the total number of transactions, 1,338, or .53% over the three years. The weighted average number of days stock was held before sale, for plaintiff FRM, was 176 in 1983, 122 in 1984, and 244 in 1985, and for plaintiff JPM, 249 in 1983, 370 in 1984, and 408 in 1985. (Pls.' SGI at 23.) No information was provided regarding the time all stock has been held after purchase. The total number of trades (sales as well as purchases) for 1983, 1984, and 1985, for both Mr. and Mrs. Mayer's accounts, was 22,239, of which sales constituted about 60%. (*Id.* at 9.)

On their original income tax returns for the three suit years, plaintiffs identified themselves as "Executive" and "Housewife," rather than as "traders," (Def.'s App. at 149, 160, 171) and "Production of Oil" (Mr. Mayer's previous occupation) as plaintiffs' "Main Business Activity" (on line A of the Schedules C attached to each of the original returns for the suit years). (*Id.* at 153–54, 164–65, 175.) They reported the expenses incurred in connection with their securities activity on Schedule A, as itemized personal deductions for non-trade or business expenses, and not on their original Schedules C (which dealt only with income and expenses from oil production). (Def.'s Resp. to Pls.' SGI at 68.)

The amended returns stated that they claimed their securities transactions as trade or business activities because during the tax years in question:

... the taxpayers' volume of activity in securities transactions and involvement individually and through the use of agents in trading securities increased substantially. This level of taxpayers' trading in securities for their own account results in their being "traders" or engaged in a trade or

business pursuant to Code Section 162 and *Ortiz v. Comm.,* 42 B.T.A. 173.

(Pls.' App. at 171, 348, 528.)

By notice mailed on April 12, 1991, plaintiffs' refund claims were disallowed. Plaintiffs filed this refund suit on June 8, 1992.

*Discussion*

A. *Summary Judgment*

Summary judgment is appropriate where no genuine issue of material fact is in dispute and the moving party is entitled to judgment as a matter of law. RCFC 56(c); *see Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 2509, 91 L.Ed.2d 202 (1986). A genuine dispute exists "only if, on the entirety of the record, a reasonable jury could resolve a factual matter in favor of the non-movant." *Sweats Fashions, Inc. v. Pannill Knitting Co.,* 833 F.2d 1560, 1562 (Fed. Cir.1987).

Inferences drawn from the underlying facts must be viewed in the light most favorable to the non-moving party. *Matsushita Elect. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986); *H.F. Allen Orchards v. United States,* 749 F.2d 1571, 1574 (Fed.Cir. 1984), *cert. denied,* 474 U.S. 818, 106 S.Ct. 64, 88 L.Ed.2d 52 (1985).

Mere denials or conclusory statements not supported by specific facts shown by affidavits or other evidence permitted by Appendix H to this court's rules are insufficient to establish the existence of a factual dispute. *See* RCFC 56(f); *Keebler Co. v. Murray Bakery Prods.,* 866 F.2d 1386, 1388–89 (Fed.Cir.1989).

B. *Trader or Investor Activity*

In a tax refund suit, the taxpayer bears the burden of proving both the error in the assessment and the amount of refund to which he is entitled. *See United States v. Janis,* 428 U.S. 433, 440, 96 S.Ct. 3021, 3025, 49 L.Ed.2d 1046 (1976). The only question here is whether, on the undisputed facts, Mr. Mayer's activities represented engaging in the trade or business of trading in securities, which would reduce plaintiffs' AMT, rather

than mere investment-related activities, which would be deductible but not reduce their AMT.

Although neither the Internal Revenue Code nor its accompanying regulations define the "activity of engaging in a trade or business," as distinguished from pursuing non-business activities for profit, *see Commissioner v. Groetzinger*, 480 U.S. 23, 27, 107 S.Ct. 980, 983, 94 L.Ed.2d 25 (1987), the concept has been incorporated in the Code virtually since its inception. *See* 1 B. Bittker, *Federal Taxation of Income, Estates and Gifts*, par. 20.1.2 n. 12 (1981) (the term "trade or business" was first utilized in the Revenue Act of 1918); *Groetzinger v. Commissioner*, 82 T.C. 793, 800, 1984 WL 15574 (1984), aff'd, 771 F.2d 269 (7th Cir.1985), aff'd, 480 U.S. 23, 107 S.Ct. 980, 94 L.Ed.2d 25 (1987) ("[t]he judicial history of the term 'trade or business' reveals it to be an amorphous creature that has resisted attempts to define it with precision."); *Steffens v. Commissioner*, 707 F.2d 478, 482 (11th Cir.1983) ("The term 'trade or business' appears in the Tax Code in over sixty places and by necessity must obtain of a functional definition according to the context in which the question arises.") (citing *Snow v. Commissioner*, 416 U.S. 500, 503, 94 S.Ct. 1876, 1878, 40 L.Ed.2d 336 (1974)).

■ There is ample case law concerning whether a taxpayer who engages in securities activities is engaged in a trade or business.[7] The courts have long distinguished between "traders" and "investors." *See, e.g., Whipple v. Commissioner*, 373 U.S. 193, 202–03, 83 S.Ct. 1168, 1174–75, 10 L.Ed.2d 288 (1963) ("investing is not a trade or business"); *see also, United States v. Generes*, 405 U.S. 93, 100–01, 92 S.Ct. 827, 831–32, 31 L.Ed.2d 62 (1972) (status as shareholder or investor was found to be a nonbusiness interest since "rewards ... flow, not from personal effort, but from investment earnings and appreciation."). The distinction rests on factual analysis. *Higgins v. Commissioner*, 312 U.S. 212, 217, 61 S.Ct. 475, 478, 85 L.Ed. 783 (1941); *accord Moller v. United States*, 721

F.2d 810, 813 (Fed.Cir.1983) *cert. denied*, 467 U.S. 1251, 104 S.Ct. 3534, 82 L.Ed.2d 839 (1984).

In *Moller*, the Federal Circuit applied longstanding Court of Claims precedent, *see, e.g., Levin v. United States*, 597 F.2d 760, 765 (Ct.Cl.1979); *Wilson v. United States*, 376 F.2d 280, 291–93 (Ct.Cl.1967), to decide that taxpayers were not engaged in trading such as to qualify for a home office expense deduction, notwithstanding that they made all their own investment decisions and devoted all their work week to these, based on the substantial duration of their stock holdings. *See also, Di Portanova v. United States*, 690 F.2d 169, 173–76 (Ct.Cl.1982). Although the Federal Circuit quoted the definition of traders in *Levin*, 597 F.2d at 765, as those deriving profits from the "direct management of purchasing and selling," *see Moller*, 721 F.2d at 813, and also agreed that a trader is an "active investor" who manipulates his holdings, and is trading for his own account, the court held that, to make a taxpayer a trader, the trading must be of the requisite regularity and frequency. *Id.* at 813.

The Federal Circuit's benchmark in *Moller* is whether "securities are purchased to be held for capital appreciation and income, usually without regard to short-term developments that would influence the price of securities on the daily market," in which case one is merely an investor, or "securities are bought and sold with reasonable frequency in an endeavor to catch the swings in the *daily* market movements and profit thereby on a short term basis," in which case one is a trader. *Moller*, 721 F.2d at 813 (emphasis added) (citing *Purvis v. Commissioner*, 530 F.2d. 1332, 1334 (9th Cir.1976) (*per curiam*) (quoting *Chang Hsiao Liang v. Commissioner*, 23 T.C. 1040, 1043 (1955))).

■ Under the Federal Circuit's tests for trading, one considers (1) the "frequency, extent, and regularity" of the securities transactions; (2) the taxpayers' investment intent; and (3) the nature of the income derived from the activity. *Moller*, 721 F.2d at 813 (citing *Purvis*, 530 F.2d at 1334).

---

7. Plaintiffs have proposed a test for trader status devised by Dr. Cattanach (consisting of answering a majority of twenty questions affirmatively), which this court declines to adopt, because it is confusing, merely self-serving, and inconsistent with governing law.

Applying these tests, *Moller* held that the taxpayer's activity was not "trading" when the income it generated was derived from dividends and interest as distinguished from the sale of securities; from the long-term holding of securities; not short-term trading; and from the capital appreciation of their stock, not short-term profits. *Id.* at 815. Short-term trading was defined as "catch[ing] the swings in the daily market movements and profit[ing] thereby on a short-term basis." *Id.* at 814 (quoting *Purvis*, 530 F.2d at 1334).

The undisputed facts here indicate that a substantial proportion of the investment activity by the external money managers was intended to achieve capital appreciation and capital gains treatment of the income and virtually none involved trading based on daily market price swings.

This appears clear from Mr. Mayer's own descriptions of the conservative investment style of the managers he engaged; his instructions explicitly expressing preference for "capital appreciation" and long-term gain; the relatively long (at least thirty days) holding periods of most of the securities involved; and the type of returns he expected to receive from these investments. *Id.* (Mr. Mayer's acknowledged investment goal was to obtain a return of ten percent over inflation for the year.) *Cf. Chang* 23 T.C. at 1045 (where the "primary, if not the sole objective, was that of an investment account established to provide a reliable source of income[,]" taxpayer is not a trader). *See also Generes*, 405 U.S. at 100–01, 92 S.Ct. at 831–32 (investor's rewards "flow, not from personal effort, but from investment earnings and appreciation").

Here, 83.8% of plaintiffs' investment income came from dividends, interest, and long-term appreciation (capital gains) and only the remainder (16.2%) was generated by "short-term" trades (although not "short-term" under the definition in *Moller*, since most of these securities were held more than thirty days). (Pls.' SGI at 52.) This indicates that Mr. Mayer's orientation was toward long-term investment and not toward income from market swings or "the very acts of trading[.]" *See Levin*, 597 F.2d at 765.

Analysis of the stocks sold for plaintiffs reveals no effort to "catch the swings in the *daily* market movements and profit thereby on a short term basis[,]" *Moller*, 721 F.2d at 813 (emphasis added). Rather, the stocks sold had typically (94.7%) been held for more than thirty days, and rarely were traded on a daily basis. (Pls.' SGI at 27.)

■ Accordingly, the above described transactions, whether conducted by Captiva and its money managers on plaintiffs' behalf or by plaintiffs themselves, and however large in number and dollar volume, are not sufficiently frequent to constitute "trading," as they do not pass the "daily market movement" test established in *Moller*.[8]

*Personal Performance*

The arguably more fundamental reason for determining that plaintiff is not entitled to treatment as a "trader" in these circumstances is simply that plaintiff is not a trader because he, personally, did not engage in (or direct) the "trading" of stocks, or the transactions related to the stocks at issue, regardless of how long they were held.[9] In fact, there is no evidence that he *personally* ever engaged in a *single* trading transaction.

■ Thus, even if each of the securities at issue had been held for the briefest possible period, and each trade had been based on minute-to-minute market fluctuations, plaintiff would not qualify as a trader. That is because he personally did not decide either which specific securities were bought, sold,

---

8. The Tax Court, based on similar facts, recently concluded that this type of activity was not trading, and denied plaintiffs' petition based on those grounds for tax years 1986–1988. *See Mayer v. Commissioner*, T.C. Memo 1994–209, slip op. at 17, 1994 WL 184398 (May 11, 1994).

9. Plaintiffs concede that it would be "a physical impossibility for any one person to make all the purchase and sales decisions that [were] made [by the money managers]" and "literally impossible for any one person to do the necessary research of that many companies and follow the market on each of them to the point [that] they could do that without working through agents." (Pls.' Statement of Genuine Issues at 29.)

and held, or when to make such trades. *See Higgins,* 312 U.S. at 214, 216–18, 61 S.Ct. at 476, 477–78.

■ To claim a trade or business deduction, the taxpayer must himself perform the activity characterizing the "trade or business." *See Groetzinger,* 480 U.S. at 35, 107 S.Ct. at 987 ("[T]o be engaged in a trade or business, the taxpayer must be involved in the activity with continuity and regularity . . ."). Non-active, indirect involvement is insufficient. *See Levin,* 597 F.2d at 765 (denying trader status for "passively accumulat[ing] earnings" or "merely oversee[ing] one's accounts").

■ The model of a trader is the taxpayer in *Levin,* 597 F.2d at 765, who devoted virtually his entire working day to manipulating his own stock holdings (through margin accounts in four to six brokerage houses), derived his entire substantial income from his own purchases and sales, and made his trading decisions based on his personal investigation of corporations' assets and management. *See also Ortiz v. Commissioner,* 42 B.T.A. 173, 185 (1940) (where taxpayer was an "active trader" and made "many short sales," gave "active attention to all purchases and sales," most of which she directed herself, "spent time at the brokers' offices" and phoned her agents daily, her activities comprised a "trade or business"); *King v. Commissioner,* 89 T.C. 445, 459, 1987 WL 45153 (1987) (active commodity trading by taxpayer himself, including 11,040 futures contracts one year and 6,711 the next, found to be a trade or business). Similarly, the Court of Claims held that delegated trading activity is not attributable to the taxpayer. *Di Portanova,* 690 F.2d at 173–76 ("taxpayer not a trader when by agreement he gave another full control and discretion over operations").

In this case, independent money managers were assigned to conduct most, if not all, of plaintiffs' securities transactions, at the manager's sole discretion. Plaintiffs have not proffered evidence of even a single specific instance when plaintiff personally directed (or vetoed) a sale or purchase. *See Snyder v. Commissioner,* 295 U.S. 134, 139, 55 S.Ct. 737, 740, 79 L.Ed. 1351 (1935).

Unlike the daily contact the plaintiff in *Ortiz* maintained with her brokers, *see Ortiz,* 42 B.T.A. at 185, the only proffered evidence of Mr. Mayer's regular contact with the managers was receipt and review of their quarterly reports and his participation in tri-annual retreats.[10] There is no evidence proffered or presented that Mr. Mayer ever responded to any specific report or that he actively participated in investment decision making that would have directed any specific stock transaction (or that he gave any other particular investment instruction) at any of the retreats.

■ Mr. Mayer's policy of giving managers three to five years without his interference to prove themselves is not consistent with direct personal trading of his portfolios. Plaintiff's "investment policy" was too broad and vague to provide meaningful trade-by-trade guidance as to what plaintiff wanted done, and thus could not have directed a manager's particular trading decision on any specific occasion. *Cf. Higgins,* 312 U.S. at 214, 218, 61 S.Ct. at 476, 478 (managerial attention held not to constitute a trade or business, despite fact that investments were made according to taxpayer's "personal[,] detailed instructions").

*Levin* holds that a trader is an "active investor" who does not "passively accumulate earnings, nor merely oversee his accounts," but who "manipulates his holdings in an attempt to produce the best possible yield," *see Levin,* 597 F.2d at 765. Under *Levin,* plaintiff is not a trader. Unlike the trader-taxpayers in *King* and *Ortiz,* who devoted their entire workdays to active trading, there is no evidence that plaintiff ever devoted even a single day to this.

■ Subscription to journals and attendance at trading seminars across the country do not substitute for actual trading. *See Wilson,* 376 F.2d at 292–93 (disallowing de-

10. Plaintiffs' allegation that Mr. Mayer had contact with the money managers on a "regular basis" by telephone, correspondence, and meetings (Cattanach Aff., Pls.' App. at 7.) is vague and unsupported and, at best, merely conclusory. As such, it is insufficient ·to establish a genuine dispute. *See Keebler,* 866 F.2d at 1388–89.

ductions for amounts spent on literature and other aids for researching stock performance).

■ Nor can salaried work for Captiva constitute a separate trade or business. *See Whipple,* 373 U.S. at 202, 83 S.Ct. at 1174 ("Devoting one's time and energies to the affairs of a corporation is not of itself, and without more, a trade or business of the person so engaged."). *See also Generes,* 405 U.S. at 102, 92 S.Ct. at 832 (stating that "corporation has a personality separate from its shareholders and ... its business is not necessarily their business")

■ Attributing Captiva's activities to plaintiff also would not qualify them as trading, since managerial oversight is not a substitute for actual trading. *See Higgins,* 312 U.S. at 218, 61 S.Ct. at 478 ("merely [keeping] records and [collecting] interest and dividends from his securities, through managerial attention for his investments," is insufficient to constitute trading activity).

Plaintiffs' theory of this case—that active *management* of active investment, or engaging in transactions with a large share volume or money value, qualifies as the trade or business of trading in securities—appears squarely to conflict with the Court of Claims' decision in *Wilson,* which held that *"managing* one's own investments in securities is not the carrying on of a trade or business, irrespective of the extent of the investments or the amount of time required to perform the managerial functions." *Wilson,* 376 F.2d at 293 (citing *Higgins,* 312 U.S. at 218, 61 S.Ct. at 478) (emphasis added).

### Conclusion

Because plaintiffs have not alleged facts that could meet their burden of proving that either personally engaged in the trade or business activity of a trader in securities, defendant's motion for summary judgment is granted and plaintiff's refund claim is denied. The clerk shall enter judgment accordingly. No costs.